Timbers, Circuit Judge, with whom Oakes, Circuit Judge, joined, filed opinion concurring in part and dissenting in part.

Frank LANZA, Jr., et al., Plaintiffs-Appellants,

v.

DREXEL & CO. et al., Defendants-Appellees,
Theodore J. Kircher and Christie F. Vitolo, Defendants-Appellants.

No. 382, Docket 35794.

United States Court of Appeals,
Second Circuit.

Original Argument Sept. 16, 1971.

Argument before the Court en banc Nov. 1, 1972.

Decided April 26, 1973.

Franklin S. Bonem, New York City (Bonnie P. Winawer and London, Buttenwieser & Chalif, New York City, of counsel), for plaintiffs-appellants Frank Lanza, Jr., Vincent Sharbo, Marie Lanza Sharbo and Clara Lanza Stefano.

James J. Higginson, New York City (Appleton, Rice & Perrin, New York City, of counsel), for defendant-appellant Theodore J. Kircher.

Ralph M. Carson, New York City (Wallace Gossett, Richard M. Berman and Davis, Polk & Wardwell, New York City, of counsel), for defendants-appellees Drexel & Co., John Ames Ballard and Bertram D. Coleman.

Krause, Hirsch & Gross, New York City, for defendant-appellant Christie F. Vitolo and defendant-appellee Leborio Pugliese.

The Securities and Exchange Commission, Washington, D. C. (Walter P. North, Acting Gen. Counsel, Theodore Sonde, Asst. Gen. Counsel, and Frederic T. Spindel, Atty., Washington, D. C.), as amicus curiae.

Before FRIENDLY, Chief Judge, and MOORE, SMITH, KAUFMAN, HAYS, FEINBERG, MANSFIELD, MULLIGAN, OAKES and TIMBERS, Circuit Judges.

MOORE, Circuit Judge:

We sit *en banc* to decide a question important to the course of evolution of the law relating to corporate directors' liabilities largely spawned by Securities and Exchange Commission (SEC) Rule 10b–5: To what extent does a director of corporation A, (1) who does not know that officers or directors of the corporation on whose board he sits have made false representations to, or have failed to disclose the inaccuracy of material information given to, or have omitted to give material information to owners of all the shares of corporation B who are exchanging their stock for that of corporation A, and (2) who has not been a participant in the negotiation of the sale or made any representation with respect thereto or had any knowledge thereof, owe a duty to such purchaser to inquire into all statements, oral and documentary, made to the stockholders of B in connection with the transaction before voting to authorize the contract formalizing the sale?

## I.

On September 16, 1971, a panel comprised of Judges Moore, Smith, and Hays heard oral argument on two appeals, both arising from a judgment entered by Judge Frankel on October 13, 1970.[1] Before any opinion was filed disposing of the appeals, this Court, *sua sponte,* filed an order on July 5, 1972, that set plaintiffs' appeal down for reargument before all judges in active service and Judges Moore and Smith on the issue of "the effect of SEC Rule 10b–5 upon the duty of an independent director of a corporation which is about to issue securities, in connection with an acqui-

---

1. The opinion below is reported in [1970–71 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 92,826 (S.D.N.Y.1970) at 90,089 [hereinafter cited as *Lanza*]. Citations will be to page numbers.

sition." At our invitation the SEC has submitted an *amicus* brief.

## II.

On December 14, 1961, Frank Lanza, Jr., Marie Lanza Sharbo, and Clara Lanza Stefano (then unmarried), son and daughters of Frank Lanza, Sr., exchanged 20,000 shares (*i. e.,* all the stock) of Victor Billiard Company (Victor) owned by them for 20,428 shares of BarChris Construction Company (BarChris). Less than one year later Bar-Chris filed a petition in bankruptcy. After an unsuccessful effort to recover their shares in a rescission action against the trustee in bankruptcy, plaintiffs borrowed $100,000 to pay the trustee for the return of their Victor shares.

Plaintiffs then commenced this action for compensatory and punitive damages against former officers and directors of BarChris. They based their suit on Section 10(b) of the Securities Exchange Act of 1934 (1934 Act) (15 U.S.C. § 78j(b) (1970) ), SEC Rule 10b–5 promulgated thereunder (17 C.F.R. § 240.-10b–5), Section 17(a) of the Securities Act of 1933 (1933 Act) (15 U.S.C. § 77q(a) (1970) ), common law fraud, and a theory of prima facie tort.[2]

After a five-week non-jury trial, Judge Frankel in a fifty-three page opinion painstakingly analyzed the facts as they related to each of the defendants and their liability or non-liability. The testimony of defendant-appellee Coleman covered 511 pages of the record. From Coleman's extended examination and cross-examination the trial judge had ample opportunity to appraise the quality of the man and his testimony. On this voluminous record Judge Frankel found: (1) that plaintiffs, through their accountant and representative Sidney Shulman, had been led by material misstatements and omissions on the part of certain officers and directors of BarChris to exchange their Victor shares for BarChris shares; (2) that plaintiffs had sustained compensable damages as a result thereof in the amount of $100,000 plus interest; (3) that defendants Christie Vitolo, president, Leonard Russo, director and vice president, and Theodore Kircher, director and treasurer, were liable to the plaintiffs under Rule 10b–5, under common law fraud, and, in the cases of Vitolo and Russo, under Section 20(a) of the 1934 Act (15 U.S.C. § 78t(a) ); (4) that *Leborio Pugliese,* vice president, was not liable under Rule 10b–5 and, assuming him to be a control person, he had established his good faith defense; (5) that defendant John Ames Ballard, director subsequent to December 14, 1961, was not liable to the plaintiffs for allegedly conspiring with Coleman, Pugliese, and one Friedman to delay plaintiffs' appreciation of their right of rescission sometime during 1962 because in fact there had been no such conspiracy; (6) that defendant Bertram D. Coleman, director, was not liable to plaintiffs under either Rule 10b–5 or Section 20(a); and (7) that the firm of which Coleman was a partner, Drexel & Company, a Philadelphia investment and brokerage firm, was not liable on a theory of *respondeat superior* for Coleman's alleged unlawful conduct.[3]

Plaintiffs appeal Judge Frankel's decision exonerating Coleman and Drexel & Co. Defendant Kircher appeals Judge Frankel's earlier denial of Kircher's demand for a trial by jury.[4] Our appellate

---

2. For the purposes of this case, Judge Frankel below considered that the requirements for a private cause of action under § 17(a) were identical to those under Rule 10b–5. *Lanza, supra* note 1, at 90,101 n. 14. We do likewise. The theories of common law fraud and prima facie tort were suggested to the court in a post-trial memorandum.

3. Judge Frankel dismissed plaintiffs' theory of prima facie tort as follows: "Their cursory argument on this subject is not substantial." *Lanza, supra* note 1, at 90,101 n. 13.

4. Kircher's appeal is not submitted to the *en banc* court. We include the panel's unanimous opinion affirming Judge

task, therefore, is to review the record in order to ascertain whether there is proof sufficient to support Judge Frankel's fact-findings and conclusions. Conversely, our task is not to re-evaluate the proof but only to determine whether the fact-findings are "clearly erroneous."

Having done so, we affirm the lower court judgment in both appeals.

### III.

Mindful that in construing Rule 10b–5 we deal with an area of the law "where glib generalizations and unthinking abstractions are major occupational hazards," [5] we set out in detail the evidence as to Coleman's knowledge of, and participation in, the negotiations leading to the December 14, 1961, Victor-Bar-Chris exchange. We note at the outset that no one disputes the finding that Kircher, aided and abetted by Vitolo, Russo, Warren Trilling, controller, and Robert Birnbaum, secretary and house counsel, violated Rule 10b–5 in making to plaintiffs untrue statements of material facts and in omitting to state material facts necessary to render the statements made, in the light of the circumstances under which they were made, not misleading. Our concern is with *Coleman's* responsibility (if any) for the fraud perpetrated by these other officers and directors, and not with whether fraud was perpetrated by such officers and directors.

As will be developed *infra,* neither the language nor intent of Section 10(b) or Rule 10b–5 would justify a holding (1) that a director is an insurer of the honesty of individual officers of the corporation in their negotiations which involve the purchase or sale of the corporation's stock or (2) that, although he does not conduct the negotiations,

participate therein, or have knowledge thereof, he is under a duty to investigate each such transaction and to inquire as to what representations had been made, by whom and to whom, and then independently check on the truth or falsity of every statement made and document presented.

Were a contrary result to be reached it would, in effect, place an affirmative duty on Coleman (and on all other directors) to intervene personally in every transaction involving the sale or exchange of his corporation's stock and would amount to a holding that a director's vote of approval for any such transaction negotiated and concluded by others, without his knowledge or participation, would be a representation to such purchasers that the director personally had inquired as to the facts upon which the negotiations were based and that he was satisfied that all representations were correct.

### A. *Background*

In *Escott v. BarChris Construction Corp.,* 283 F.Supp. 643 (S.D.N.Y.1968), purchasers of debentures issued by BarChris sued the defendants herein and others pursuant to Section 11 of the 1933 Act (15 U.S.C. § 77k (1970) ). As did Judge Frankel, we adopt portions of the late Judge McLean's statement of the history of BarChris up to May 16, 1961, the date the debenture registration statement became effective:

BarChris was an outgrowth of a business started as a partnership by Vitolo and Pugliese in 1946. The business was incorporated in New York in 1955 under the name of B & C Bowling Alley Builders, Inc. Its name was subsequently changed to BarChris Construction Corporation.

---

Frankel's denial of Kircher's motion for a trial by jury *infra.*

Defendants Vitolo and Pugliese have reached a settlement with the plaintiffs. Defendant Russo's appeal was dismissed by this court as untimely. While plaintiff-appellants' notice of appeal indicates

that they challenge Judge Frankel's dismissal of the complaint as to defendant Ballard, they have not argued to this Court that that dismissal was erroneous.

5. SEC v. National Securities, Inc., 393 U.S. 453, 465, 89 S.Ct. 564, 571, 21 L.Ed. 2d 668 (1969).

The introduction of automatic pin setting machines in 1952 gave a marked stimulus to bowling. It rapidly became a popular sport, with the result that "bowling centers" began to appear throughout the country in rapidly increasing numbers. BarChris benefited from this increased interest in bowling. Its construction operations expanded rapidly. It is estimated that in 1960 BarChris installed approximately three per cent of all lanes built in the United States. It was thus a significant factor in the industry, although two large established companies, American Machine & Foundry Company and Brunswick, were much larger factors. These two companies manufactured bowling equipment, which BarChris did not. They also built most of the bowling alleys, 97 per cent of the total, according to some of the testimony.

BarChris's sales increased dramatically from 1956 to 1960. According to the prospectus, net sales, in round figures, in 1956 were some $800,000, in 1957 $1,300,000, in 1958 $1,700,000. In 1959 they increased to over $3,300,000, and by 1960 they had leaped to over $9,165,000.

\* \* \* \* \* \*

In general, BarChris's method of operation was to enter into a contract with a customer, receive from him at that time a comparatively small down payment on the purchase price, and proceed to construct and equip the bowling alley. When the work was finished and the building delivered, the customer paid the balance of the contract price in notes, payable in installments over a period of years. BarChris discounted these notes with a factor and received part of their face amount in cash. The factor held back part as a reserve.

In 1960 BarChris began a practice which has been referred to throughout this case as the "alternative method of financing." In substance this was a sale and leaseback arrangement. It involved a distinction between the "interior" of a building and the building itself, i. e., the outer shell. In instances in which this method applied, BarChris would build and install what it referred to as the "interior package." Actually this amounted to constructing and installing the equipment in a building. When it was completed, it would sell the interior to a factor, James Talcott Inc. (Talcott), who would pay BarChris the full contract price therefor. The factor then proceeded to lease the interior either directly to BarChris's customer or back to a subsidiary of BarChris. In the latter case, the subsidiary in turn would lease it to the customer.

Under either financing method, BarChris was compelled to expend considerable sums in defraying the cost of construction before it received reimbursement. As a consequence, BarChris was in constant need of cash to finance its operations, a need which grew more pressing as operations expanded.

\* \* \* \* \* \*

By early 1961, BarChris needed additional working capital. The proceeds of the sale of the debentures involved in this action were to be devoted, in part at least, to fill that need.[6]

Drexel & Company was the lead underwriter of the debenture offering. Coleman joined the BarChris board of directors in connection with this transaction in April of 1961, and served until March of 1962, when he resigned.[7]

Liability was premised in *Escott* solely upon the statutory basis of Section 11, *supra,* which permit[s] any person

6. 283 F.Supp. 643, 653–654 (S.D.N.Y. 1968) (footnotes omitted).

7. Coleman returned as chairman of the board in July, 1962, and stayed on in that capacity until October, 1962, when BarChris petitioned for an arrangement under Chapter XI of the Bankruptcy Act. *See Lanza, supra* note 1, at 90,091, 90,098.

acquiring a security issued under a registration statement containing an untrue statement of a material fact or omitting a required statement to sue "every person who signed the registration statement" (15 U.S.C. § 77k(a)(1) ). Coleman had signed; hence, he was liable regardless of his knowledge of material inaccuracies. The law applicable to the case now before us is in direct contrast to the absolute liability (except for the due diligence defense) imposed by Section 11.

B. *The Negotiations Leading to the Exchange of Victor and BarChris Shares: A Chronology*

In March of 1961, Frank Lanza, Jr., an owner of Victor stock, met representatives of BarChris at a trade meeting, at which time the possibility of a Victor-BarChris exchange was first discussed. Because both Lanza and Vincent Sharbo (Marie's husband), a secretary-treasurer of Victor, had "modest academic training," and were not versed in "business theory, finance, accounting or securities trading,"[8] they relied upon their friend and accountant, Sidney Shulman, throughout the upcoming negotiations. His role was central for plaintiffs throughout the negotiations. Shulman for many years had been the accountant for the Lanzas and their enterprise. They relied upon him in the transaction here in question to study the financial papers and other data and to advise them in light of such study. His role in this respect was plain to all concerned on both sides of the deal.[9]

Coleman was not present at this meeting and there is no proof that he knew of the meeting or its purpose.

At the first meeting held for the definite purpose of discussing the acquisition of Victor, on July 28, 1961, Shulman requested of Kircher information on BarChris so that he could make "an educated suggestion"[10] to his clients. Kircher gave to Shulman the annual report for 1960, and the May 16, 1961, prospectus. In response to a question for more recent financial data, Kircher had Trilling bring to Shulman the working papers for the six-month statement for the period ending June 30, 1961. During the meeting Shulman "casually glanced" at the prospectus. In his deposition Shulman stated that:

> This meeting was an exploratory meeting, at which time we were given information to acquaint us with it. He [Kircher] asked innumerable questions pertaining to Victor, and we told him, and then arranged to meet about a week later in Philadelphia to see the plant and go into further discussion.[11] Coleman was not present at this meeting.

On August 3, 1961, the parties met again, this time in Philadelphia. The purpose was two-fold: (1) to give the officers of BarChris the opportunity to see the physical plant, and to go over any statements if Kircher so desired; and to give Vincent Sharbo and Lanza a chance to ask any questions that they wanted to ask after having had a week to study the prospectus.[12] This meeting ended with Shulman's proposal of the terms of sale: plaintiffs would receive $350,000, long-term employment agreements, participation in the pension fund, and all the other benefits accruing to the officers of BarChris.

Coleman was not present at this meeting.

It was after this meeting that Shulman decided to recommend the merger with BarChris to the plaintiffs.[13]

On August 17th Trilling sent to Shulman the BarChris six-month statement and a copy of the 1960 annual report.

---

8. *Id.* at 90,091.

9. *Id.* at 90,092.

10. Deposition of Sidney Shulman, Plaintiffs' Exhibit No. 150, at 18 [hereinafter cited as Exh. No. 150]. This deposition was received into evidence at the trial.

11. *Id.* at 25.

12. *Id.* at 27.

13. *Lanza, supra* note 1, at 90,094, n. 3.

On September 27, 1961, Shulman, in New York on other business, spoke to Kircher in the latter's office for about one hour. According to Shulman, "I [Shulman] asked him, 'How is BarChris' business?' He says, 'Good; and every day it's getting better.' And he said to me, 'Well, let's get down to cases,' and we bargained." [14] This meeting concluded with Kircher's assurance that while BarChris could not promise in the contract to provide working capital to Victor, the $100,000 requested by Victor would be forthcoming. While there were a few telephone conversations during October between Kircher and Shulman, the latter did not ask Kircher for any further financial information concerning BarChris because he felt that he "had all the information [he] thought was necessary." [15] On November 3, 1961 Shulman met with Kircher and other officers of BarChris in New York to discuss details of the exchange contract.

Coleman was not present at these meetings.

On November 6, 1961, the BarChris board approved the Victor-BarChris exchange and passed a resolution empowering Kircher and Birnbaum to enter into an exchange contract with the Victor shareholders "in form considered and approved by this meeting." (Minutes of November 6, 1961.)

Coleman was not present at this board meeting.

The first time that Coleman heard of the proposed Victor acquisition (on approximately November 13th) was when he received in the mail the minutes of the November 6, 1961, meeting of the BarChris board of directors, which he had not attended. According to the minutes, Kircher and Birnbaum had summarized the acquisition for the board, and the board had passed a resolution empowering Kircher and Birnbaum to enter into the necessary contract.

On November 21, 1961, the Victor acquisition contract was presented to the board and approved. Coleman was present at this meeting. The contract was signed under date of November 27, 1961, by the three shareholder plaintiffs and by Vitolo. The closing took place on December 14, 1961, in Philadelphia.

Coleman did not attend the closing.

The record clearly supports Judge Frankel's finding that "Coleman neither participated in nor knew of any deception practiced upon the plaintiffs" and, as the Judge noted:

It is not suggested that Coleman himself ever communicated anything to plaintiffs or Shulman; that he ever in any sense "withheld" anything from them; or that he was ever advised of what things had been said or left unsaid in the negotiations with them.[16]

Thus, when the Victor-BarChris transaction first came to Coleman's attention it was already a completed transaction, approved by the board, and it had been negotiated without any knowledge or participation on Coleman's part as to any representations or omissions of material facts made by representatives of BarChris.

We turn now to the evidence relating to Coleman's conduct as a director of BarChris and to his knowledge (or, better, his lack of knowledge) of the misstatements and omissions made by Kircher et al. to the plaintiffs.

C. *Coleman's Conduct as a Director of BarChris*

We initially point out that the only documents concerning BarChris received by plaintiffs prior to the closing on December 14, 1961, were the 1960 annual report (dated March 10, 1961), the May 16, 1961, debenture prospectus, and BarChris's financial statement for the six-month period ending June 30, 1961. Shulman also read in the *Wall Street Journal* news of the revision of the six

14. Exh. No. 150, *supra* note 10, at 36.

15. *Id.* at 54.

16. *Lanza, supra* note 1, at 90,104.

months' earnings from thirty to twenty cents per share. It was stipulated by the parties herein that as of May 16, 1961, the effective date of the debenture registration statement, Coleman had no knowledge of any untruth in the prospectus or of any omission of necessary fact.

Apart from Coleman's lack of knowledge of the Victor-BarChris transaction, reference should be made to his familiarity with BarChris's financial affairs and his activities as a director thereof. We begin in August of 1961 when Coleman, while on vacation, read in the *Wall Street Journal* that BarChris had revised its published earnings for the first six months of 1961 from thirty to twenty cents per share due to the bankruptcy of a bowling alley customer. Coleman thereafter received the financial statement reflecting the revised earnings. This was the same statement that Trilling, BarChris's controller, sent to Shulman on August 17, 1961. Coleman believed that this revised financial statement was true.[17]

Coleman thereafter called Kircher for an explanation of the earnings revision. Kircher stated that Stratford Bowl, a customer of BarChris, had gone bankrupt and that owing to a deficiency in documentation, BarChris might be in an unsecured position. Kircher stated that BarChris hoped to be able to purchase Stratford from the bankruptcy trustee and resell the alley. Kircher explained

that the bankruptcy of the alley had been caused by an incapable operator.

At a board meeting on September 13, 1961, Coleman and Grant, director and outside counsel for BarChris, demanded that every effort be made to correct any deficiencies in documentation which could result in an unsecured position for BarChris on the bowling alleys of customers. At the board meeting of October 17, 1961, Birnbaum, secretary and house counsel of BarChris, reported that steps had been taken to correct such deficiencies and that BarChris's potential exposure to loss had been reduced to approximately $100,000.

At the September 13, 1961, meeting Coleman was advised that a contract had been signed for construction of the Bowl-A-Way alley, which he had first heard about in June of 1961. The contract price was $1,400,000, making it the largest single job in the history of BarChris.

In late October Coleman saw a document entitled "An Important Report to the Financial Community." This report is not relevant in this case since the plaintiffs never saw it and since they were awarded damages in the nature of restitution.[18] However, Coleman's reaction to it does illustrate the nature of his conduct as director. The report spoke in exaggerated terms of BarChris's earnings prospects and diversification program. Coleman believed that parts of this document were inaccurate and misleading,[19] and decided to take

---

17. Transcript of Trial at 2985.

18. On the basis of Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), decided subsequent to the date that the three-judge panel heard the appeals herein, plaintiffs claim that the court below should have awarded damages based upon the difference between the actual value of the BarChris securities issued to plaintiffs and the value those securities would have had in the absence of any deception. The appraisal of the value which the stock market might have put on this knowledge would have been highly speculative. In light of our disposition of plaintiffs' appeal, we do not consider this argument.

19. Testimony of Coleman:

> [Document handed to the witness]
> I consider this release to be one which was puffy in tone. It doesn't say anything of great importance. It doesn't overestimate sales, at least it didn't to my way of thinking at the time. It didn't overestimate earnings. It did have something on the back of it like three balls in the area here, A, B, BC, the A standing for American Machine & Foundry, the B standing for Brunswick, two of the largest in the industry, and BC standing for BarChris.
> Now you could imply, "And now there are three," that there is some similarity in size between these three.

corrective action. He discussed the matter with Grant to determine what steps should be taken. As a result Grant obtained from the board of directors at the meeting of November 6, 1961, a resolution providing that all financial information to be released by BarChris would be submitted to counsel for prior approval.

At the board meeting of November 21, 1961, the Victor acquisition contract was presented and approved. Coleman was present at this meeting. Birnbaum summarized the terms of the contract, while Kircher explained the method of calculating the exchange ratio. Coleman remarked that, in his opinion, the $250,000 price for Victor seemed high, but Kircher explained that the billiard tables would be an additional recreational item to be placed in bowling alleys and would be a useful diversification for BarChris. There was no discussion of the negotiations which over the months had taken place with the plaintiffs.

Coleman was never advised of what documents or other information had been given to them.

At this time Coleman's opinion of the business and financial condition of BarChris was that the outlook was good, although not as good as it had been at the time of the debenture offering.[20] The nine month earnings figures—prepared by the accounting department and Kircher—were above the comparable figures for the previous year, although third quarter figures were roughly equal. BarChris was in a tight cash position, but it was still doing a lot of business. While Coleman knew of a few customer defaults and the fact that BarChris was operating some five alleys, he believed that on balance the outlook was good. As of this time BarChris had built some seventy-five alleys.

1. *The point-of-crisis meeting.*

On December 6, 1961, one month after the Victor stock transaction had been approved and two weeks after the contract authorization, a special meeting of the BarChris board was called to consider the impending resignation of Vitolo as president and the installation of Russo in his place. At this meeting, attended by Coleman, Kircher read a prepared statement, endorsed by Birnbaum and Trilling, the purpose of which was to oppose the projected elevation of Russo and to expose underlying problems within the company. As summarized by

---

Now it is true that BarChris was probably the third force in the bowling industry at this time, but very much smaller than the other two. It is that type of thing that is sort of—

The Court: Now, you have said several times, and counsel make a good deal of this, and I think perhaps the record ought to show at least your view of it, that something can be inaccurate but not false. And I take it that is the thing to which you are applying it. In what respect was it inaccurate?

The Witness: It was an exaggeration.

The Court: And a thing, if it is a characterization is inaccurate but not necessarily false, is that what you are saying?

The Witness: That's my general context. . . .

Transcript at 2735–37.

20. Testimony of Coleman:
 My general opinion of the financial condition of BarChris at this time was that although it was in a tight cash position it was still doing a lot of business. They were building a number of alleys. I knew the fact that they were building a number for T-Bowl under contract.

 They were building some others in New England, they were building the Bowl-A-Way job for the Feldman brothers; an alley I believe in Toronto.

 I knew that at this time they were still buying sites, in fact I think in the fall of 1961 they bought half a dozen sites in areas which they considered to be favorably situated in North Carolina and Florida, District of Columbia and I believe one in Arizona.

 I also knew at this time that there were at least three defaults that had taken place but I would say that on balance I thought that the outlook, although not as good as it had been at the time of the debenture offering, was still good.

 *Id.* at 3020–21.

Judge Frankel, this statement asserted that:

(1) BarChris was then "at a point of crisis."

(2) "[C]ompetition [in the bowling industry was] becoming sharper and earnings [were] begin[ning] to wane."

(3) "Such factors as low down payments, poor credit risks, high financing costs, poorly written contracts, improper documentation, inadequate cost estimation and the like," perhaps not material when the market was booming, were taking on new significance for BarChris as the industry entered darker days.

(4) There was "a consistent pattern of organizational laxity and faulty judgment" apparent in the management of BarChris.

(5) "[T]he practice of the execution by Mr. Russo of legal documents without legal representation" caused exposure to substantial losses. Examples of this mentioned were Stratford Bowl, "in which case an improperly executed document [had] resulted in the Company losing its position as a secured creditor in the bankruptcy proceeding * * *;" Bridge Lanes, "where an underlying lease preclude[d] financing of the $400,000 interior package;" and T-Bowl International, where "an overriding agreement," covering all the planned Bar-Chris-built bowling alleys, should have been, but had not been, executed before any construction contracts were entered into.

(6) The announcement of $1 per share estimated earnings for the year ending December 31, 1961, reiterated at a meeting of securities analysts in late November, was based on unwarranted hopes or forecasts, including inaccurate predictions as to completion of jobs in progress and the ultimately unrealized possibility that sale and leaseback agreements producing substantial gains would be concluded before the end of 1961.

(7) There was an "excessive concern over the price of the Company's stock and the tendency to make decisions based on the reaction of the stock market to such decisions."[21]

### 2. Coleman's response

At the point-of-crisis meeting Coleman realized that a feud had developed within management.[22] He thought that the situation could be corrected by securing outside help.[23] At this meeting the board was informed first of a decline in earnings, but, as noted, BarChris's nine-month earnings report was better than that of the previous year. Second, the board learned that low down payments and high credit risks were taking on added significance as the industry entered darker days. Coleman did inquire of Kircher what he had

---

21. *Lanza, supra* note 1, at 90,097.

22. Testimony of Coleman:
Q. My question to you now is did you change your opinion of the business and financial condition of BarChris as a result of hearing that statement, and, if so, tell us in what ways?
A. No, I don't think I changed my opinion of the business, my opinion of the financial condition of BarChris. I certainly felt that there was a management crisis at hand.
Transcript at 3023.

23. Testimony of Coleman:
The Court: In the meeting of December 6, 1961 did you believe that this was a grave accusation, important for you in your role as a director?

The Witness: I thought the whole accusation was grave, yes, sir.
The Court: And did you feel that you ought to take steps to save yourself one way or another on the issues raised by Mr. Kircher's charges against Russo and others?
The Witness: I don't think I thought I had to make a specific investigation of each charge. I think that I thought that this thing represented a crisis in management, that one group of the management had obviously come to an impasse with the other group, and that we ought to get some outside help to see what could be done about putting the company's affairs in order.
*Id.* at 2877.

meant by low down payments; Kircher replied that as competition in the industry became keener, and because BarChris's customers were not affluent, it was important for BarChris to obtain larger down payments.[24]

Third, the board was told of organizational laxity. Coleman concluded that BarChris needed a management consultant. Such a consultant was retained at the meeting held on December 19, 1961. Fourth, while the board was informed that legal documents had been poorly drawn, Birnbaum reported to the board that he hoped to reduce the exposure resulting from such contracts up to $100,000. Fifth, the board was informed that the prediction made by Russo at a securities analysts' meeting in November had been unrealistic. Coleman inquired of Kircher shortly thereafter as to what meeting he had referred to.[25] Kircher replied that it had been a small meeting at the offices of BarChris. The dollar projection made at the meeting was apparently never reported in the press.

Finally, the Kircher group told the board that at BarChris there was an excessive concern with the price of the company's stock. Coleman, however, testified that he disagreed with this observation, and that he had not noticed a pattern of actions or business decisions dictated by an excessive concern over the price of BarChris stock.[26]

Coleman respected and trusted Kircher's integrity and competence, and he never had reason to doubt this judgment. As Judge Frankel concluded, "[t]he accounting devices of Kircher et al. deceived not only the investing public, but Coleman as well."[27]

Coleman's conduct was summarized by Judge Frankel as follows:

Coleman was not aware or even suspicious that plaintiffs were being deceived during the negotiations with Kircher. At least until after the closing, he had no knowledge or belief that any hard figures published by BarChris were false or misleading. He knew of some negative developments—of customer defaults, declining new orders and the stringent cash situation. He came to know, too, a week or so before the closing, that there was dissension among the officers. He had no reason to suspect that Kircher had not disclosed all

---

24. Testimony of Coleman reviewing the minutes of the point-of-crisis meeting:

Mr. Kircher goes on to say such factors as low down payments, poor credit checkings, high financing costs, poorly written contracts, incomplete documentation, inadequate cost estimation when they appear in a booming industry tend to be lost in the shuffle take on a different light in today's market.

As to low down payments I didn't understand what Mr. Kirchner meant there, whether he thought that BarChris wasn't getting their 15 or 25 percent. I did ask him shortly after this meeting, I don't know the exact date, what he meant, and Mr. Kircher stated that he thought the down payments, even of 15 to 25 percent, were too low in an industry such as the bowling industry where you are dealing with non-affluent customers. He also indicated that it became increasingly important to have a higher equity position and higher down payment.

*Id.* at 2883-84.

25. *Id.* at 2890.

26. Testimony of Coleman:

On the stock question, I had not noticed any actions or business decisions which in my opinion were dictated by concern over the price of the stock at this time, and I didn't notice any up until the time of the Escott case. When we got the Escott minutes, I did see one minute of an executive committee meeting, I believe it was in March or February of 1960, which was prior to the prospectus, which spoke of the negotiation or the possible negotiation with Brunswick of a $15 million or $16 million contract, and Russo at that time indicated that he wanted this contract signed, sealed and delivered with great hast [sic] because he said it will make the most marvelous publicity.

Now, as far as I know that is the only instance that came to my attention where a business decision was dictated by concern over the price of the stock.

*Id.* at 2893-94.

27. *Lanza, supra* note 1, at 90,105.

these facts to plaintiffs; on the contrary, after Kircher's criticisms of the corporation at the "point of crisis" meeting, Coleman might well have looked upon him as the most capable and reliable member of management. Coleman had been aware that at least one public release, in October of 1961, had contained misleadingly optimistic statements—a fact about which he complained and on which he pressed, seemingly successfully, for administrative correction at a directors' meeting on November 6, 1961. He had no reason to suspect that this was other than an isolated incident, that there was any concerted effort to mislead either the public or the plaintiffs. As other troubles became apparent to him, both before and after the October episode, he moved with other directors for corrective measures—demanding repair of loose contract practices, opposing Russo's proposed elevation to the presidency, voting for the retention of a management consultant, and resisting what he viewed as an excessive stock dividend.[28]

In rejecting plaintiffs' claim that Coleman violated Rule 10b–5, Judge Frankel concluded that:

> The claim fails because of two . . . propositions—one of fact, the second of law:
>
> (1) Coleman neither participated in nor knew of any deception practiced upon the plaintiffs;
>
> (2) in the circumstances disclosed by the record, he was under no duty to investigate more than he did at the material times or to seek out and advise the plaintiffs in any way.[29]

■ We have no difficulty in affirming Judge Frankel's finding of fact. Our review of the evidence demonstrates that the finding that Coleman did not know of, or knowingly participate in, any deception practiced upon plaintiffs

is amply supported by the evidence and at the very least is not clearly erroneous. See Fed.R.Civ.P. 52(a).

The debate thus comes to this: What duty, if any, does Rule 10b–5 impose on a director in Coleman's position to insure that all material, adverse information is conveyed to prospective purchasers of the corporation's stock where the director does not know that these prospective purchasers are not receiving all such information? (The term "adverse" is used only because the claim is made in the complaint that the financial condition of BarChris was worse than as represented by Kircher, Vitolo, and Russo.)˙ We will frequently refer to this hypothetical duty hereinafter as the "duty to convey."

■ We conclude that a director in his capacity as a director (a non-participant in the transaction) owes no duty to insure that all material, adverse information is conveyed to prospective purchasers of the stock of the corporation on whose board he sits. A director's liability to prospective purchasers under Rule 10b–5 can thus only be secondary, such as that of an aider and abettor, a conspirator, or a substantial participant in fraud perpetrated by others.[30] Because Coleman owed no duty as a director to insure that they received information not conveyed to them by Kircher et al., and because Coleman was not an aider and abettor of, a conspirator in, or a substantial participant in the fraud perpetrated upon these plaintiffs, the complaint against Coleman and Drexel & Company was properly dismissed.

## IV.

The history of Section 10(b) and the history of the entire 1934 Act makes it clear that the

> essence of the Rule is that anyone who, trading for his own account in

28. *Id.*

29. *Id.* at 90,104.

30. *See* Ruder, Multiple Defendants In Securities Law Fraud Cases: Aiding and Abetting. Conspiracy, *In Pari Delicto*, Indemnification, and Contribution, 120 U.Pa.L.Rev. 597 (1972).

the securities of a corporation has "access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone" may not take "advantage of such information knowing it is unavailable to those with whom he is dealing" . . . .[31]

The promulgation of the Rule itself appears to have been prompted by an incident in which the president of a corporation was discovered to be buying his company's shares while misrepresenting to sellers the earnings prospects of the company.[32] The chief concern relative to the duties of directors evident in the legislative history of Section 10(b) of the 1934 Act—including the Pecora investigation report,[33] the House Report on H.R. 9323,[34] the Senate report on S.

31. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 848 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), quoting Chairman Cary in Cady, Roberts & Co., 40 S.E.C. 907, 912 (1961); Speed v. Transamerica Corp., 99 F.Supp. 808, 829 (D.Del.1951) (Leahy, Ch. J.), modified and aff'd, 235 F. 2d 369 (3d Cir. 1956):

> The duty of disclosure stems from the necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed minority stockholders. It is an attempt to provide some degree of equalization of bargaining position in order that the minority may exercise an informed judgment in any such transaction. . . .
> One of the primary purposes of the [1934 Act] was to outlaw the use of inside information by corporate officers and principal stockholders for their own financial advantage to the detriment of uninformed public security holders.

32. It was one day in the year 1943, I believe. I was sitting in my office in the S.E.C. building in Philadelphia and I received a call from Jim Treanor who was then the Director of the Trading and Exchange Division. He said, "I have just been on the telephone with Paul Rowen," who was then the S.E.C. Regional Administrator in Boston, "and he has told me about the president of some company in Boston who is going around buying up the stock of his company from his own shareholders at $4.00 a share, and he has been telling them that the company is doing very badly, whereas, in fact, the earnings are going to be quadrupled and will be $2.00 a share for this coming year. Is there anything we can do about it?" So he came upstairs and I called in my secretary and I looked at Section 10(b) and I looked at Section 17, and I put them together, and the only discussion we had there was where "in connection with the purchase or sale" should be, and we decided it should be at the end.

> We called the Commission and we got on the calendar, and I don't remember whether we got there that morning or after lunch. We passed a piece of paper around to all the commissioners. All the commissioners read the rule and they tossed it on the table, indicating approval. Nobody said anything except Sumner Pike who said, "Well," he said, "we are against fraud, aren't we?" That is how it happened.

Freeman, Conference on Codification of the Federal Securities Laws: Administrative Procedures, 22 Bus.Law, 793, 891, 922 (1967). The quotation is taken from remarks made by Mr. Freeman in a discussion following the presentation of his paper at a securities law symposium.

33. Senate Comm. on Banking & Currency, Stock Exchange Practices, S.Rep.No.1455, 73d Cong., 2d Sess. (1934). This report, some 394 pages in length, devotes 13 pages to the activities of corporate directors. The only point it makes relevant to our inquiry is summed up as follows:

> The Securities Exchange Act of 1934 aims to protect the interests of the public against the predatory operations of directors, officers, and principal stockholders of corporations by preventing them from speculating in the stock of the corporations to which they owe a fiduciary duty.

Id. at 68 (explaining the purpose of section 16(b)).

34. H.R.Rep.No.1383, 73d Cong., 2d Sess. (1934). This report lists six purposes of the proposed legislation: (1) control of credits; (2) control of manipulative stock market practices (e. g., wash sales, matched orders, stock market pools); (3) the provision of adequate and honest reports to security holders by registered corporations; (4) control of unfair practices by corporate insiders; (5) control of exchanges and over-the-counter markets; and (6) administrative reform. Id. at 7–16.

3420,[35] and the Conference report[36] on the bill that became the 1934 Act—was a desire to

> . . . protect the interests of the public by preventing directors, officers, and principal stockholders of a corporation, the stock of which is traded in on exchanges, from speculating in the stock on the basis of information not available to others.[37]

With respect to the proper scope of the Rule, it has been stated that "both the general objectives of federal securities legislation, especially as reflected in those provisions of section 12(2) of the 1933 Act which closely parallels the language of 10b–5(2), and the common law background should be highly relevant in determining the proper interpretation of the Rule."[38]

## A. *A Director's Duty to Convey at Common Law*

The common law is relevant in interpreting Rule 10b–5 both because it was against a common law background that Section 10(b) was passed and because the duties of directors are still primarily defined by state and not federal law.

There was as of 1934 no common law duty upon directors to insure that all material, adverse information be conveyed to prospective purchasers. Lord Halsbury's famous opinion in Dovey v.

Cory,[39] provides an apt illustration of this principle.

In *Dovey* the House of Lords affirmed a Court of Appeals decision discharging a director (Cory) of breach of duty with respect to the preparation of a fraudulent balance sheet and the payment of advances in violation of the bank's articles of association. The balance sheet allegedly fraudulently overstated profits and led to the payment of dividends impairing the bank's capital. It was admitted by the plaintiff that Cory had not been conscious of the fraud perpetrated by certain officers and other directors of the bank. Lord Halsbury analyzed Cory's liability for neglect of his duties as follows:

> The charge of neglect appears to rest on the assertion that Mr. Cory, like the other directors, did not attend to any details of business not brought before them by the general manager or the chairman, and the argument raises a serious question as to the responsibility of all persons holding positions like that of directors, how far they are called upon to distrust and be on their guard against the possibility of fraud being committed by their subordinates of every degree. It is obvious if there is such a duty it must render anything like an intelligent devolution of labour impossible. Was

35. S.Rep.No.792, 73d Cong., 2d Sess. (1934). This report likewise contains no evidence of any attention to the obligations of directors to insure that all material, adverse information is conveyed to prospective purchasers of the company's stock. Indeed, this report's explanation of the civil liability provisions of the bill gives rise to the inference that no such duty was intended:

> [T]he bill provides that any person who unlawfully manipulates the price of a security, or who induces transactions in a security by means of false or misleading statements, or who makes a false or misleading statement in the report of a corporation, shall be liable in damages to those who have bought or sold the security at prices affected by such violation or statement. In such case the burden is on the plaintiff to show the viola-

tion or the fact that the statement was false or misleading, and that he relied thereon to his damage. The defendant may escape liability by showing that the statement was made in good faith.

*Id.* at 12–13 (explaining §§ 9 and 18 of the bill).

36. H.R.Rep.No.1838, 73d Cong., 2d Sess. (1934) (to accompany H.R. 9323).

37. S.Rep.No.792, 73d Cong., 2d Sess. 9 (1934).

38. Comment, Negligent Misrepresentations Under Rule 10b–5, 32 U.Chi.L.Rev. 824, 828 (1965). See III L.Loss, Securities Regulation 1430–42 (2d ed. 1961), [hereinafter cited as Loss], VI Loss 3534–53 (Supp.1969).

39. [1901] A.C. 477.

Mr. Cory to turn himself into an auditor, a managing director, a chairman, and find out whether auditors, managing directors, and chairmen were all alike deceiving him? That the letters of the auditors were kept from him is clear. That he was assured that provision had been made for bad debts, and that he believed such assurances, is involved in the admission that he was guilty of no moral fraud; so that it comes to this, that he ought to have discovered a network of conspiracy and fraud by which he was surrounded, and found out that his own brother and the managing director (who have since been made criminally responsible for frauds connected with their respective offices) were inducing him to make representations as to the prospects of the concern and the dividends properly payable which have turned out to be improper and false. I cannot think that it can be expected of a director that he should be watching either the inferior officers of the bank or verifying the calculations of the auditors himself. The business of life could not go on if people could not trust those who are put into a position of trust for the express purpose of attending to details of management. If Mr. Cory was deceived by his own officers—and the theory of his being free from moral fraud assumes under the circumstances that he was—there appears to me to be no case against him at all. The provision made for bad debts, it is well said, was inadequate; but those who assured him that it was adequate were the very persons who were to attend to that part of the business; and so of the rest.[40]

One other example should suffice. In Barnes v. Andrews[41] an outside director was sued by a receiver, *inter alia*, for the expenses of printing pamphlets and circulars used in selling shares. The receiver alleged that the circulars had con-

tained false statements. Judge Learned Hand denied recovery:

> Second, I do not think that Andrews is to be charged with such detail of supervision as was involved in going over the circulars personally. True, I have held him accountable for not acquainting himself with the conduct of the business more intimately than he did; but there is a limit. It seems to me too much to say that he must read the circulars sent out to prospective purchasers and test them against the facts. That was a matter he might properly leave to the officers charged with that duty. He might assume that those who prepared them would not make them fraudulent. To hold otherwise is practically to charge him with detailed supervision of the business, which, consistently carried out, would have taken most of his time. If a director must go so far as that, there will be no directors.
>
> It is argued that he had actual notice of the circulars, because copies were sent to him, as to all other stockholders. That, indeed, gave him an opportunity to learn the facts; but it did not charge him with any duty which had not theretofore existed. It might prove that he did know of the frauds, but that is all. No such proof was made.[42]

At common law, then, there was no obligation upon directors to insure that all material, adverse information be conveyed to prospective purchasers of the company's stock. As Professor, later Dean, Shulman wrote:

> A related, and similarly justified, principle of limitation [at common law] is that liability should be imposed for the consequences of one's own misconduct, not vicariously for the misconduct of others. Denial of recovery to a plaintiff may, then, be rested upon a finding that the defendant did not personally participate in

40. *Id.* at 485–86. *Accord*, Prefontaine v. Grenier, [1907] A.C. 101, 109–11 (P.C. 1906) (Quebec).

41. 298 F. 614 (S.D.N.Y. 1924).

42. *Id.* at 620.

the misrepresentation. The defendant may have been an inactive director in the company which issued the statement. He may have lent his name simply to adorn the board without undertaking or being asked to undertake any duties of supervision. Or he may have become a director for the purpose of advising on limited, specific phases of the company's business. Or he may have suited his own whim or convenience in his attention to company matters, attending to some and ignoring others. If, for whatever reason, the director took no part in the preparation, ratification or issuance of the false statement or circular, he is not liable, it has been held, to purchasers who acted on the faith of the statement. He has done nothing. And he is not to be held vicariously for the fraud or negligence of others, co-directors, executives or underwriters, unless he has constituted them his "agents." It may be urged, as it has been held in other connections, that the director is not sought to be held liable vicariously for another's tort, but directly for his own neglect properly to perform the duties of his office; that by consenting to be named a director he comes under certain affirmative obligations imposed by law which he must discharge at the pain of liability for his neglect; that the liability imposed is for his own disregard of the duties inseparably attached to his office. But while there has been much preaching about the fiduciary character of the director's of-

fice, the great trust and confidence invested in it by shareholders and others, and the sacred duty resting upon directors not to betray their trust and to discharge their duties well, nonparticipation in the issuance of a prospectus or circular has been for directors a quite invulnerable armor against civil liability.[43]

The "armor" of non-participation referred to by Dean Shulman is unquestionably forged by the proposition that a director's first loyalty must be to the shareholders of the company on whose board he sits.[44] It is simply inconsistent with this proposition to argue that, absent aiding and abetting, conspiracy, or substantial participation, a director of corporation A in negotiations looking to the exchange of stock with the stockholders of corporation B should concentrate not only on protecting the interests of the shareholders of A, but also on insuring that the shareholders of B receive all material, adverse information about corporation A.

## B. *Section 11 of the 1933 Act*

Further indication that Congress did not intend Section 10(b) of the 1934 Act to impose a duty to convey on directors is found in the legislative history of Section 11 of the 1933 Act, the one section of the securities acts squarely directed to the obligation of directors to insure that accurate information is conveyed to prospective purchasers of a company's stock.[45]

43. Shulman, Civil Liability and the Securities Act, 43 Yale L.J. 227, 240–41 (1933) (footnotes omitted). For the common law view of liability for negligent misrepresentation as of 1934, see Bohlen, Should Negligent Misrepresentations Be Treated As Negligence or Fraud 18 Va.L.Rev. 703, 707 (1932):

It is safe to prophesy that no such duty [to use reasonable care to disclose those dangerous conditions of which one is aware] will be imposed where the transaction is a commercial or financial one. Commercial ethics have improved but it is doubtful whether during the lifetime of any man now living they will reach

a peak of perfection which requires those who play the commercial or financial game to lay their cards face upward on the table.

44. Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939); Seaboard Indus., Inc. v. Monaco, 442 Pa. 256, 276 A.2d 305 (1971); Diamond v. Oreamuno, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969); 3 W. Fletcher, Corporations § 838 (rev. vol. 1965).

45. *See* 2 A. Bromberg, Securities Law—Fraud—SEC Rule 10b–5, § 8.4 (505), at 204.106 (1971):
"If there is a Congressional intent [as to the elements of a private cause

### 1. *The legislative reports.*

In proposing the passage of a Securities Act, President Roosevelt included in his message to Congress the following statement regarding the purpose of the legislation: "The purpose of the legislation I suggest is to protect the public with the least possible interference to honest business."[46]

The House Bill, H.R. 5480, contained a provision substantially similar to present Section 11.[47] The following passages from the House report on H.R. 5480 evidence the attitude of the House with respect to the duties imposed on directors by the section:

> The duty of care to discover varies in its demands upon participants in security distribution with the importance of their place in the scheme of distribution and with the degree of protection that the public has a right to expect. . . .
>
> . . . . . .
>
> . . . [T]o require them [directors] to guarantee the absolute accuracy of every statement that they are called upon to make, would be to gain nothing in the way of an effective remedy and to fall afoul of the President's injunction that the protection of the public should be achieved with the least possible interference to honest business. . . . The demands of this bill call for the assumption of no impossible burden, nor do they involve

any leap into the dark. Similar requirements have for years attended the business of issuing securities in other industrialized nations. They have already been readily assumed in this country by honest and conservative issuers and investment bankers. Instead of impeding honest business, the imposition of liabilities of this character carries over into the general field of security selling, ethical standards of honesty and fair dealing common to every fiduciary undertaking.

> . . . . . .
>
> . . . The responsibility imposed is no more nor less than that of a trust. It is a responsibility that no honest banker and no honest business man should seek to avoid or fear. To impose a lesser responsibility would nullify the purposes of this legislation. To impose a greater responsibility, apart from constitutional doubts, would unnecessarily restrain the conscientious administration of honest business with no compensating advantage to the public.[48]

The Senate sharply disagreed. Its proposed civil liability provision was Section 9 of S. 875:

> Every person acquiring any securities specified in such statement and offered to the public shall be presumed to rely upon the representations set forth in the said statement. In case any such registration state-

---

of action under the Rule], it must be inferred from the words of § 10(b) and the Rule . . . or from the juxtaposition of § 10(b) and the Rule with other portions of the 1933 and 1934 Acts . . . . ."

In his article analyzing *Escott* Professor Folk raises questions concerning the § 11 duties of directors that strikingly foreshadow the issue in today's decision:
[M]ust directors verify information in the sense that they must go beyond a careful, probing, primarily oral inquiry into the facts stated?

. . . . .

. . . To what extent may he [a director] rely upon reports of officers and other responsible corporate personnel?

Folk, Civil Liabilities Under the Federal Securities Acts: The *BarChris* Case, 55 Va.L.Rev. 1, 199, at 69, 39 (1969) [hereinafter cited as Folk].

46. Letter from Franklin D. Roosevelt to Congress, Mar. 29, 1933, *reprinted in* I Loss, *supra* note 38, at 127. This letter is in both House and Senate reports. H.R.Rep.No.85, 73d Cong., 1st Sess. 1 (1933) ; S.Rep.No.47, 73d Cong., 1st Sess. 6 (1933).

47. H.R. 5480, 73d Cong., 1st Sess. § 11 (1933). The section is described in essentially its present form (it was slightly amended in 1934) in H.R.Rep.No.85, 73d Cong., 1st Sess. 21–23 (1933).

48. H.R.Rep.No.85, 73d Cong., 1st Sess. 9, 5, 9–10 (1933).

ment shall be false or deceptive in any material respect, any persons acquiring any securities to which such statement relates, either from the original [sic] issuer or from any other person, shall have the right to rescind the transaction and to obtain the return, either at law or in equity, of any and all consideration given or paid for any such securities upon the surrender thereof, either from any vendor knowing of such falsity or from the persons signing such statement, jointly or severally. Every person acquiring any security by reason of any false or deceptive representation made in the course of or in connection with a sale or an offer for sale or distribution of such securities shall have the right to recover any and all damages suffered by reason of such acquisition of such securities from the person or persons signing, issuing, using, or causing, directly or indirectly, such false or deceptive representation, jointly or severally: . . .[49].

In explaining the stricter obligations that this bill imposed on directors, the Senate report struck a balance between protection of the investor and interference with honest business, a balance which denied any weight to the latter interest:

The committee has been confronted with the problem of the contrasted equities where untrue information as to material facts shall be given in any registration statement upon which the buyer presumably relies. This goes to the essence of the relief to the public. Shall the signers on behalf of the corporation be exempt from liability if it cannot be shown that they knew of the false or erroneous character of the representations made?

The question is whether ignorance of an untruth should excuse the director and leave the loss upon the buyer. To do so in our opinion would fail to give the buyer the needed relief and fail to restore confidence. If one of

two presumably innocent persons must bear a loss, it is familiar legal principle that he should bear it who has the opportunity to learn the truth and has allowed untruths to be published and relied upon. Moreover he should suffer the loss who occupies a position of trust in the issuing corporation toward the stockholders, rather than the buyer of stock who must rely upon what he is told.

The committee believes it to be essential to accomplish the objects of the act to make the directors executing the registration statement liable for the consequences of untrue statements rather than to throw the loss on the buyer.

Accordingly the registration of false information under the bill makes not only the issuer, but the directors who sign, civilly liable for return of the money which the purchaser paid for the security. If a director can excuse himself by saying that he has in good faith relied upon an accountant's statement, or the statement of some other person, then the investor will continue in the same position from which the Nation is struggling to extricate him. It has been stated in prospectuses repeatedly that the information given is believed by the company to be true, but not guaranteed. But it is the issuer who is in position to learn the facts, not the public.

This phase of the law will have a direct tendency to preclude persons from acting as nominal directors while shirking their duty to know and guide the affairs of the corporation. Upon the discharge of this duty the public and stockholders rely in good faith. We cannot but believe that many recent disastrous events in the investment world would not have taken place if those whose names have appeared as directors had known themselves to be under a legal, as well as a moral, responsibility to the investing public.[50]

---

49. S. 875, 73d Cong., 1st Sess. § 9 (1933), 77 Cong.Rec. 2981 (1933).

50. S.Rep.No.47, 73d Cong., 1st Sess. 4–5 (1933).

The Act, as enacted, rejected the stricter approach toward directors' responsibility urged by the Senate. In explaining why the conferees adopted the House approach the Conference Report provided:

A point of difference between the House bill and the Senate amendment concerned the civil liability of persons responsible for the flotation of an issue. The Senate amendment imposed upon the issuer, its directors, its chief executive and financial officers, a liability which might appropriately be denominated as an insurer's liability. They were held liable without regard to whatever care they may have used for the accuracy of the statements made in the registration statement. The House bill, on the other hand, measured liability for these statements in terms of reasonable care, placing upon the defendants the duty, in case they were sued, of proving that they had used reasonable care to assure the accuracy of these statements. The standard by which reasonable care was exemplified was expressed in terms of a fiduciary relationship. A fiduciary under the law is bound to exercise diligence of a type commensurate with the confidence, both as to integrity and competence, that is placed in him. This does not, of course, necessitate that he shall individually perform every duty imposed upon him. Delegation to others of the performance of acts which it is unreasonable to require that the fiduciary shall personally perform is permissible. Especially is this true where the character of the acts involves professional skill or facilities not possessed by the fiduciary himself. In such cases reliance by the fiduciary, if his reliance is reasonable in the light of all the circumstances, is a full discharge of his responsibilities. In choosing between these two standards of liability, the Senate accepted the standards imposed by the House bill.[51]

James M. Landis, one of the authors of the 1933 Act, contended that these words were intended to have more than the usual significance that is attached to legislative history:

The Conference Report also deliberately contained language commenting upon the meaning of certain of the most contentious provisions of the bill in the hope that that language as an expression of the "intent" of Congress would control the administrative and judicial interpretation of the act. This is particularly true with respect to the nature of the fiduciary obligations assumed by officers and directors of a registrant. It seemed impossible to define in statutory language the extent to which a fiduciary might lawfully delegate his duties to others. In lieu of such an effort, resort was made to general language in the report to indicate that a goodly measure of delegation was justifiable, particularly insofar as corporate directors are concerned.[52]

## 2. The English Companies Act.

In enacting the Securities Act, Congress explicitly relied upon similar provisions in the English Companies Act.[53] Section 11 was closely patterned after Section 37 of the English Companies Act, 1929.[54] Thus cases interpreting

51. H.R.Rep.No.152, 73d Cong., 1st Sess. 26 (1933).

52. Landis, The Legislative History of the Securities Act of 1933, 28 Geo.Wash.L. Rev. 29, 47–48 (1959) (footnotes omitted).

53. Id. at 34; Folk, supra note 45, at 13–17. See H.R.Rep.No.85, 73d Cong., 1st Sess. 9 (1933): "The Committee is fortified in these sections [§§ 11 and 12] by similar safeguards in the English Companies Act of 1929."

54. Section 37 provides in relevant part:
(1) Where a prospectus invites persons to subscribe for shares in or debentures of a company—
(a) every person who is a director of the company at the time of the issue of the prospectus; . . .

Section 37 have relevance in construing Congressional intent concerning the obligations imposed by Section 11 upon outside directors.

In Stevens v. Hoare[55] the Court of Chancery construed Section 37 as follows:

[T]he case has been argued on the part of the plaintiff as if the statute had required of a director not merely reasonable, but sufficient, grounds for his belief. Indeed, it was rather suggested that a director is not entitled to rely upon the assistance or advice of solicitors or clerks, but that with his own hands and eyes he must search out and read every relevant document, and with his own mind judge of its operation and legal effect, and that he is not entitled to state anything in a prospectus that he could not depose to of his own knowledge in a Court of justice. If so he would be bound to do a great deal more than the most industrious and prudent man of business could think of doing, or in most cases would be able to do, in the conduct of his own affairs.[56]

In Adams v. Thrift,[57] the Court of Chancery held directors liable under the section for failing to make any inquiry of the person who had prepared the prospectus and whose interest was adverse to the company's.[58]

Section 11, unlike Section 37, imposes on directors an affirmative duty of reasonable investigation of the accuracy of a registration statement.[59] The fact that Congress so changed the thrust of Section 37 buttresses the contention that Congress paid careful attention to common law doctrine concerning the duty of

---

shall be liable to pay compensation to all persons who subscribe for any shares or debentures on the faith of the prospectus for the loss or damage they may have sustained by reason of any untrue statement therein, or in any report or memorandum appearing on the face thereof, or by reference incorporated therein or issued therewith, unless it is proved—

(i) that having consented to become a director of the company he withdrew his consent before the issue of the prospectus, and that it was issued without his authority or consent; or

(ii) that the prospectus was issued without his knowledge or consent, and that on becoming aware of its issue he forthwith gave reasonable public notice that it was issued without his knowledge or consent; or

(iii) that after the issue of the prospectus and before allotment thereunder, he, on becoming aware of any untrue statement therein, withdrew his consent thereto, and gave reasonable public notice of the withdrawal, and of the reason therefor; or

(iv) that—

(a) as regards every untrue statement not purporting to be made on the authority of an expert or of a public official document or statement, he had reasonable ground to believe, and did up to the time of the allotment of the shares or debentures, as the case may be, believe, that the statement was true;
. . . . ."

Companies Act, 1929, 19 & 20 Geo. 5, c. 23, § 37(1).

55. 20 T.L.R. 407 (Ch.1904).

56. *Id.* at 409.

57. [1915] 1 Ch. 557, affd, [1915] 2 Ch. 21 (C.A.).

58. The proceeds from the sale of stock were to be used to purchase two companies. The promoter of the purchases prepared the prospectus. Liability was predicated on a finding of gross neglect of duty:

Unfortunately, the defendants collectively did nothing. On the evidence, as it stands, no inquiries were made, no proofs were called for, no questions were asked, no advice was taken, and no investigation whatever was made by the board. As a board they seem to have treated the settling and approving of the prospectus, prepared and put before them by the man whose interest it was to exaggerate and inflate the value of everything the company was about to acquire, as a mere formality.
[1915] 1 Ch. at 565.

59. *Compare* 1933 Act § 11(b)(3)(A) (15 U.S.C. § 77k(b)(3)(A)) ("he [the director] had, after reasonable investigation. [*sic*] reasonable ground to believe and did believe") *with* English Companies Act, 1929, 19 & 20 Geo. 5, c. 23, § 37(1) ("he [the director] had reasonable ground to believe, and did up to the time of the allotment of the shares . . . believe").

directors to insure that accurate information is conveyed to the purchasers of the company's stock and reinforces the conclusion therefrom that if Congress intended Section 10(b) to change common law doctrine in a similar respect it would have said so in unmistakable terms.

### 3. The 1934 Amendments.

In response to substantial criticism, in particular that directed to Section 11,[60] Congress in passing the 1934 Act amended in several particulars the 1933 Act.[61] While most of the amendments are not of great substance, the amendment to Section 15 of the 1933 Act is worthy of note.[62] Prior to amendment, that section held control persons absolutely liable for the Section 11 or Section 12 violations of those whom they controlled.[63] The amendment added the clause "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." Senator Fletcher's memorandum explained the purpose of a similar amendment to be

> to restrict the scope of the section so as more accurately to carry out its real purpose. The mere existence of

control is not made a basis for liability unless that control is effectively exercised to bring about the action upon which liability is based.[64]

However, here, even if Coleman is deemed to be a "control" person, the trial court found that he did not exercise that "control" to bring about the action upon which liability is based.

### C. Sections 11 and 12(2) of the 1933 Act and Section 20(a) of the 1934 Act.[65]

Plaintiffs could not have brought their action pursuant to Section 11 of the 1933 Act. They did not purchase registered securities and, even if they had, their claims are founded on several non-registration statement communications. Nor were the securities that they received required to be registered; they were exempt under the private offering exemption of Section 4(2). Nor could plaintiffs have brought the action pursuant to Section 12(2). That section requires privity[66] or, in the absence of privity, scienter.[67] As Professor Folk has observed:

> Under section 12(2), unlike section 11(a), liability does not result solely from signing a registration statement or occupying a status such as that of

---

60. 78 Cong.Rec. 10185 (1934) (remarks of Senator Byrnes); Folk, supra note 45, at 18; III Loss, supra note 38, at 1725. See, e. g., 78 Cong.Rec. 4984, 8710 (1934) (remarks of Senator Thomas).

61. 1934 Act, ch. 404, §§ 201–09, 48 Stat. 905–08.

62. 1934 Act, ch. 404, § 208, 48 Stat. 908.

63. Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable.
1933 Act, ch. 38, § 15, 48 Stat. 84.

64. 78 Cong.Rec. 8669 (1934). The amendment offered by Senator Fletcher read:

[insert after last word of 48 Stat. 84] unless the act for which such controlled person is alleged to be liable under section 11 or 12 was not performed at the direction of the controlling person nor to enable such controlling person to evade liability under said sections.
S. 3420, 73d Cong., 2d Sess. § 208 (1934), 78 Cong.Rec. 8668 (1934).

65. We rely without discussion on the proposition that the 1933 and 1934 Acts are to be construed in pari materia. VI Loss, supra note 38, at 3915–17.

66. See III Loss, supra note 38, at 1719–20, VI Loss at 3836–41, and cases cited therein.

67. Barnes v. Osofsky, 373 F.2d 269, 272 (2d Cir. 1967) (dictum). For the rationale for permitting actions under § 12 (2) when scienter is shown, see III Loss, supra note 38, at 1716.

a director. Officers and directors may be directly liable under section 12(2) as "participants" in the sale, but such liability depends upon proof of the facts in each case and for each person, not merely upon a certain status.[68]

 It is apparent that in passing the 1933 Act Congress could not have intended that purchasers of securities who could not sue directors under Section 11 could sue such directors (unless privity or scienter were found) under Section 12(2). Since the public interest in private offerings is less than that in public offerings,[69] the duties imposed upon directors in private offerings were intended to be correspondingly less stringent.

 To impose a duty to convey upon directors under Rule 10b–5 would be to ignore this Congressional intent. It would take away from directors what is granted to them by the private offering exemption and by the limitation of the due diligence duty to registration statements. It would also nullify the control section of the 1934 Act—Section 20. The intent of Congress in adding this section, passed at the same time as the amendment to Section 15 of the 1933 Act, was obviously to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons. Judge Adams' remarks in his exhaustive review of the legislative history of Rule 10b–5 in Kohn v. American Metal Climax, Inc.[70] are apposite in this regard:

Essential to the elements intended by Congress are the requirements that the defendant has acted in other than "good faith" and that the plaintiff has "relied" on the misleading statement. . . . There is no evidence that Congress intended that under Section 10(b) anyone should be an insurer against false or misleading statements made non-negligently or in good faith.

It seems clear from the discussion of the legislative history of Section 10(b) and the administrative history of Rule 10b–5 that Congress and the SEC both intended, before any liability for misrepresentation might attach, that the element of culpability be present. This intent was manifested by the constant usage of words such as "cunning," "manipulative," "deceptive," "fraudulent," "illicit," "fraud," and lack of "good faith," and the absence of language indicating liability for negligent or non-negligent conduct.[71]

D. *Case Law Development of Rule 10b–5*

 Rule 10b–5, however, cannot be construed solely on the basis of a close reading of legislative history. The law of the Rule has moved far from its original moorings. And we are aware that the Rule must be read flexibly, not technically and restrictively. But reading the Rule flexibly does not relieve us of the obligation to define the limits of liability imposed by the Rule and to adhere to common sense. Where a claim is made that is clearly beyond the scope of the Rule, even flexible reading will not legitimatize that claim.

The cases brought to our attention and those which our research has discovered confirm the conclusion that the Rule does not impose upon directors a duty to convey. Those cases focus, not unexpectedly, on Sections 12(2) of the 1933 Act, Section 20(a) of the 1934 Act, or on secondary theories of liability such as aiding and abetting, not on Rule 10b–5.[72]

68. Folk, *supra* note 45, at 206.

69. H.R.Rep.No.85, 73d Cong., 1st Sess. 5 (1933) ; Landis, *supra* note 52, at 37.

70. 458 F.2d 255 (3d Cir.), cert. denied, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972).

71. 458 F.2d at 280 (concurring and dissenting).

72. *See* Demarco v. Edens, 390 F.2d 836 (2d Cir. 1968) (finding an issuer not liable under § 15, 1933 Act, for the material omissions of its best-efforts underwriter) ;

In _Mader v. Armel_[73] plaintiff-shareholders of corporation A sued the officers and directors of corporation B alleging that the latter has fraudulently induced the plaintiffs to exchange their stock. The district court after trial dismissed plaintiffs' case against two directors of corporation B, Tibbals and Young. The party primarily responsible for the fraud perpetrated upon the plaintiffs was Armel, president, chief executive officer, and chairman of the board of corporation B. Both Tibbals and Young "had implicit confidence in Armel and . . . neither of them had any reason to doubt their confidence in him until after the events which are determinative in this case."[74]

The Sixth Circuit affirmed both dismissals, holding that the case against Tibbals was properly dismissed because there was no evidence to support the conclusion that

> Tibbals either knew there was anything wrong or should have known that there was anything wrong, or in any way, factually or legally, controlled anyone who knew that or was in combination for any purpose with anyone who knew or should have known that anything was wrong.[75]

The dismissal as to Young was affirmed because, although found to be a control person for purposes of Section 20(a), he had established his good faith defense:

> [H]e did nothing directly or indirectly to induce the fraudulent proxy solicitation; . . . "he did not have the slightest idea anything was wrong until sometime in 1960 at the earliest;" and . . . "he relied fully on the Certified Public Accountants who

bore a good reputation" and upon the annual published certifications of these accountants.[76]

The Ninth Circuit's opinion in _Wessel v. Buhler_[77] provides further indication of the distance we would travel were we to agree with plaintiffs that Rule 10b–5 imposes upon directors a duty to convey. In _Wessel_ plaintiffs argued, _inter alia,_ that an accountant retained by an issuer owes a duty pursuant to the Rule to disclose to prospective purchasers of the issuer's stock his knowledge of the issuer's adverse financial condition. The Court replied:

> There is not a scrap of authority supporting this extraordinary theory of Rule 10b–5 liability, and we will not supply any in this case.

> We find nothing in Rule 10b–5 that purports to impose liability on anyone whose conduct consists solely on inaction. On the contrary, the only subsection that has any reference to an omission, as distinguished from affirmative action, is subsection (2) providing that it is unlawful "to omit to state a material fact necessary in order to make the statements made *.* * not misleading," i. e., an omission occurring as part of an affirmative statement. (_See_ Brennan v. Midwestern United Life Insurance Co. (7th Cir. 1969) 417 F.2d 147, 154–155.) We perceive no reason, consonant with the congressional purpose in enacting the Securities and Exchange Act of 1934, thus to expand Rule 10b–5 liability. . . . On the contrary, the exposure of independent accountants and others to such vistas of liability, limited only by the ingenuity of investors and their counsel, would lead to serious mischief.[78]

---

Gould v. Tricon, Inc., 272 F.Supp. 385, 392 (S.D.N.Y.1967) (finding that a director has no duty under § 12(2) to inquire into the background of a co-director whose biography was included in a prospectus and which contained a material omission).

73. 461 F.2d 1123 (6th Cir.), cert. denied, 409 U.S. 1023, 93 S.Ct. 465, 34 L.Ed. 2d 315 (1972).

74. 461 F.2d at 1125.

75. _Id., quoting_ Judge Hogan's findings below.

76. _Id._ at 1126, _quoting_ Judge Hogan.

77. 437 F.2d 279 (9th Cir. 1971).

78. _Id._ at 283 (citation omitted).

In this Circuit, *Moerman v. Zipco, Inc.*,[79] supports the proposition that a director's obligation to prospective purchasers is secondary, not primary, and must be found, if at all, in provisions other than Rule 10b–5 or in the doctrines of aiding and abetting, conspiracy, or substantial participation. In *Moerman* plaintiff sued officers and directors of an issuer who had sold stock to him in violation of Section 12(1) and, allegedly, Section 12(2) and Rule 10b–5. The Section 12 claims were held time-barred by Section 13 of the 1933 Act. But the Court did find that the officer who had failed to inform the plaintiff, in conversations with him, of all material information was liable under the Rule. In analyzing the liability of the other directors, the Court did not even mention the possibility that these directors might be liable to plaintiff directly under the Rule: "Since Moerman had no significant contact with any defendant other than Sam Nasser [the officer referred to above], the liability of the other defendant officers and directors must rest solely on Section 20 of the Securities Exchange Act . . . . [Referring to the responsibility of directors for the acts of corporate officers, the Court concluded:] Directors cannot be expected to exercise the kind of supervision over a corporation president that brokers must exercise over salesmen."[80]

While the issue of the liability of the directors under Rule 10b–5 was not raised on appeal,[81] this Court said in an opinion denying a petition for rehearing: "Since the opinion of Judge Judd appealed from, some 20 pages in length, dealt fairly and in a reasoned fashion with all of the issues in the case, affirmance was upon that opinion."[82]

Even the broker-dealer cases, which, as Judge Judd observed in *Moerman* generally hold that a broker-dealer must exercise stringent supervision over its salesmen,[83] offer support for our conclusion that Rule 10b–5 does not impose upon directors a duty to convey. For example, in Kamen & Co. v. Paul H. Aschkar & Co.,[84] plaintiff claimed, *inter alia*, that a broker-dealer was liable under the Rule for fraud perpetrated by two of the defendant's agents. The Ninth Circuit agreed with the lower court that the partners of the defendant did not know nor did they have reason to know of the fraud of their agents. Like the court in *Moerman*, the Ninth Circuit analyzed the defendant's liability not in terms of the Rule but in terms of Section 20 of the 1934 Act.[85]

Other cases in this circuit clearly indicate that "facts amounting to *scienter*, intent to defraud, reckless disregard for the truth, or knowing use of a device, scheme or artifice to defraud" are essential to the imposition of liability (Mansfield, C. J., in Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445, (2d Cir. 1971)). Underlying our decisions in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964); Schoenbaum v. Firstbrook, 405

79. 302 F.Supp. 439 (E.D.N.Y.1969), aff'd on opinion below, 422 F.2d 871 (2d Cir.), petition for rehearing denied by opinion, 430 F.2d 362 (2d Cir. 1970) *(per curiam).*

80. 302 F.Supp. at 446–447. The court dismissed the Rule 10b–5 claims against all of the directors because "[t]he uncontradicted evidence is that none of the defendants knew or in any way induced Nasser's fraud. While other defendants participated in the sale of unregistered securities for which they may have incurred personal liability under Section 12(1), no plan or conspiracy to defraud purchasers was shown." *Id.*

81. The issue on appeal was Judge Judd's finding that defendants had violated Connecticut's Blue Sky Law. *See* 302 F. Supp. at 448–451.

82. 430 F.2d at 363.

83. *See* III Loss, *supra* note 38, at 1712–19; VI Loss at 3834–40.

84. 382 F.2d 689 (9th Cir. 1967), cert. dismissed, 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1968).

85. *See* 382 F.2d at 697.

F.2d 215 (2d Cir. 1968) (en banc), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); Globus v. Law Research Serv. Inc., 418 F.2d 1276 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S. Ct. 913, 25 L.Ed.2d 93 (1970), and Heit v. Weitzen, 402 F.2d 909 (2d Cir. 1968), cert. denied, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969), is a factual background that officers and/or directors, who participated in the transactions, had inside knowledge of situations which resulted in a fraud upon the other party to the transaction and to the advantage of themselves or their corporation. Thus, in *Texas Gulf Sulphur* the decision was based upon a failure properly to disclose "good news" and the reaping thereby of substantial financial benefits by certain defendants. In *Ruckle* and *Schoenbaum* liability to their corporation was imposed upon directors for *knowingly* selling stock at an unwarranted discount. In *Globus* the offering circular omitted material facts and this Court affirmed a plaintiff's judgment because "Judge Mansfield's charge clearly required a finding of scienter, albeit not using the *magic words* 'intent to defraud'" and because this "instruction satisfied the scienter requirement imposed by prior cases" (Kaufman, C. J., 418 F.2d at 1291). In *Heit* the fraud emanated from the Annual Report of the Belock Instrument Company which report allegedly contained "'materially false, misleading and untrue statements of Belock's net assets and past and prospective income'" (402 F.2d at 911) and from documents filed by the individual defendants.

We recognize that *participation* by a director in the dissemination of false information reasonably calculated to influence the investing public may subject such a director to liability under the Rule.[86] But it is quite a different matter to hold a director liable in damages for failing to insure that all material, adverse information is conveyed to prospective purchasers of the company's stock absent substantial participation in the concealment or knowledge of it. Absent knowledge or substantial participation we have refused to impose such affirmative duties of disclosure upon Rule 10b–5 defendants.

In Levine v. SEC [87] the revocation of a broker-dealer's registration was affirmed on the basis of the broker-dealer's actual knowledge of misrepresentations in a report used in the offer and sale of securities:

Levine asserts that this intimacy gave him a right to rely on the statements of Cosnat's [the company's] management concerning its business affairs, that he had no reason to doubt the accuracy of [the company's] statements and that he (or any broker-dealer for that matter) was not required to go behind these statements. Of course, absent actual knowledge or warning signals, a broker-dealer should not be under a duty to retain his own auditor to re-examine the books of every company, the stock of which he may offer for sale, even accepting the doubtful hypothesis that such permission would be granted.[88]

In SEC v. Great American Indus., Inc.[89] we reversed the trial court for declining to issue a temporary injunction against a corporation and its officers who had more than negligently issued misleading press releases and who had failed to include in other releases and reports material information. We specifically declined even to consider the issue of whether the corporation or its officers had a duty under Sections 13(a) or 10(b) of the 1934 Act to disclose information *which they neither knew nor had reason to know*.[90]

86. SEC v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 862.

87. 436 F.2d 88 (2d Cir. 1971).

88. *Id.* at 90. We found both actual knowledge and warning signals. *Id.* at 91.

89. 407 F.2d 453 (2d Cir. 1968) *(en banc)*, cert. denied, 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969).

90. 407 F.2d at 459.

A most thorough judicial treatment of the relationship between knowledge and an affirmative duty to convey is to be found in Judge Eschbach's opinions in Brennan v. Midwestern United Life Ins. Co.[91] In *Brennan* persons purchasing Midwestern stock from a particular brokerage firm brought a class action under the Rule against Midwestern. The brokerage firm had failed to deliver to the plaintiffs Midwestern stock for which they had paid, the firm having used plaintiffs' purchase money as working capital for speculation and for other improper purposes. Plaintiffs claimed that Midwestern was liable for aiding and abetting the brokerage firm's violation of the Rule by knowing of, but failing to report, the firm's activities to the SEC or to the Indiana Securities Commission.

In his opinion denying Midwestern's motion to dismiss, Judge Eschbach analyzed Midwestern's potential liability under the Rule as an aider and abettor. He was careful to begin by finding on the facts alleged a violation of the Rule by the brokerage firm. He concluded that the 1934 Act "cannot be held necessarily to exclude persons who do no more than aid and abet a violation of Section 10(b) and Rule 10b–5." [92] Support for this conclusion was found not only in prior cases but also in the proposition that common law principles should guide interpretation of the Rule. At common law one is liable

[F]or harm resulting to a third person from the tortious conduct of another, . . . if he

\* \* \* \* \* \*

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, . . . .[93]

Midwestern contended that it could not be found liable under the Rule unless it had committed an affirmative act in furtherance of the brokerage firm's violation. Judge Eschbach replied:

Certainly, not everyone who has knowledge of improper activities in the field of securities transactions is required to report such activities. This court does not purport to find such a duty. Yet, duties are often found to arise in the face of special relationships, and there are circumstances under which a person or a corporation may give the requisite assistance or encouragement to a wrongdoer so as to constitute an aiding and abetting by merely failing to take action.[94]

After trial Judge Eschbach concluded that Midwestern had in fact substantially assisted and encouraged the brokerage firm's violation of Rule 10b–5. The evidence supporting this conclusion consisted, *inter alia*, of the following: (1) officers of Midwestern knew (a) of misrepresentations made by the agents of the brokerage firm, (b) that the brokerage firm was using money paid for Midwestern stock as working capital and (c) that this conduct by the brokerage firm was improper; (2) Midwestern had actually in one instance reported, and threatened at several points to report, the activities of the brokerage firm to the Indiana Securities Commission; (3) the officers of Midwestern viewed the sales efforts of the brokerage firm in Midwestern stock as a benefit and they elected to pursue this benefit; and (4) officers of Midwestern backed down from their threat to report the slow deliveries of Midwestern stock by the brokerage firm in the face of continued slow deliveries knowing that such a retreat would encourage the firm to continue its practices without fear of a report from Midwestern to the Indiana Securities Commission.[95]

91. 259 F.Supp. 673 (N.D.Ind.1966) (motion to dismiss denied), 286 F.Supp. 702 (N.D.Ind.1968) (on merits), aff'd, 417 F.2d 147 (7th Cir. 1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed. 2d 397 (1970).

92. 259 F.Supp. at 676.

93. *See* 259 F.Supp. at 680, *quoting* Restatement of Torts § 876(b) (1939).

94. 259 F.Supp. at 681–682.

95. *See* 286 F.Supp. at 708–724.

In affirming Judge Eschbach's judgment, the Seventh Circuit said:

> It is our view that the district court was correct in concluding that Midwestern's acquiescence through silence in the fraudulent conduct of Dobich [major owner, president, and chief executive officer of the brokerage firm] combined with its affirmative acts was a form of aiding and abetting cognizable under Section 10(b) and Rule 10b–5. Here Midwestern's failure to report Dobich after December 1, 1964 was more than omission; it was a signal to Dobich that further inquiries would not be handled as earlier threatened, and that Dobich would be given an opportunity to cover his non-deliveries.[96]

Plaintiffs also insist that Coleman is liable to them even absent an affirmative duty, as a director, to scrutinize the BarChris-Victor negotiations prior to giving his approval of the sale. Coleman knew many disquieting facts about BarChris, particularly certain adverse financial developments and the making of misleading statements to the financial community by BarChris officers. Thus it is argued that it was inexcusable for Coleman, armed with such knowledge, not to ascertain whether BarChris's financial status had been fully and accurately disclosed to the prospective buyers. The plaintiffs suggest that if Coleman had inquired into the details of the BarChris-Victor negotiations, he would have discovered the fraud. In that event, Coleman could not have approved the sale of BarChris's stock to the Lanzas without incurring liability. Recognizing, however, that the record in this case cannot support a holding that Coleman's failure to inquire was in any way willful or calculated, plaintiffs, and our dissenting Brothers, urge that liability exists under Rule 10b–5 for a "negligent" omission to state material facts. They rely heavily on language in SEC v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 855, stating that

a review of other sections of the Act from which Rule 10b–5 seems to have been drawn suggests that the implementation of a standard of conduct that encompasses negligence as well as active fraud comports with the administrative and the legislative purposes underlying the Rule. Finally, we note that this position is not, as asserted by defendants, irreconcilable with previous language in this circuit because *"some form* of the traditional scienter requirement," . . . sometimes defined as "fraud," . . . is preserved. This requirement, whether it be termed lack of diligence, constructive fraud, or unreasonable or negligent conduct, remains implicit in this standard . . . . (footnote omitted, emphasis in original)

This language appears to recognize negligence as a standard for imposing liability under Rule 10b–5. Judge Waterman's opinion in that case, however, did not deal with a private action, but with an SEC enforcement suit seeking injunctive relief. This distinction was underscored in the concurring opinions of Judges Friendly, Kaufman and Anderson and has been noted in subsequent decisions. See SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1096 & n.15 (2d Cir. 1972). Although one commentator recently stated that "The question whether scienter is a required element under rule 10b–5 . . . must be regarded as open at this time [because] [t]he circuit courts are either split or in confusion," Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, *In Pari Delicto,* Indemnification, and Contribution, 120 U.Pa.L.Rev. 597, 631 (1972), our recent decision in Shemtob v. Shearson, Hammill & Co., *supra*, eliminated any doubt that proof of scienter is required in private actions in this circuit. There, in the context of a private action for damages, we stated that no violation of Rule 10b–5 occurs "in the absence of allegation of facts amounting to *scienter,*

---

96. 417 F.2d at 154–155.

intent to defraud, reckless disregard for the truth, or knowing use of a device, scheme, or artifice to defraud. It is insufficient to allege mere negligence." 448 F.2d at 445. Under the *Shemtob* test, a plaintiff claiming a violation of Rule 10b–5 who cannot prove that the defendant had actual knowledge of any misrepresentations and omissions must establish, in order to succeed in his action, that the defendant's failure to discover the misrepresentations and omissions amounted to a willful, deliberate, or reckless disregard for the truth that is the equivalent of knowledge.

We recognize, of course, that other circuits have expressed approval of a "negligence" standard. *See, e. g.*, Ellis v. Carter, 291 F.2d 270, 274 (9th Cir. 1961). But we do not find these statements persuasive. In addition to the inappropriateness of a negligence standard demonstrated by comparing liability under Section 10(b) of the Securities Exchange Act with liability under Section 11 of the Securities Act, *supra*, we believe the actual language of Section 10(b) bars adoption of a negligence standard. Rule 10b–5(b), the provision under which the Lanzas seek relief, makes it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." Yet the rule-making power granted to the Securities and Exchange Commission by Section 10(b) authorizes rules making it unlawful "[t]o use or employ . . . . any *manipulative* or *deceptive* device or contrivance . . . ." (emphasis added). These words negate liability for a mere negligent omission or misrepresentation. Rather, "proof of fraud is required in suits under § 10(b) of the 1934 Act and Rule X–10 B–5 . . . ." Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 786 (2d Cir. 1951). *See* VI Loss, Securities Regulation 3884–86. Moreover, despite the use of "negligence" language in Ellis v. Carter, *supra*, and other cases cited by our dissenting Brothers,

> the appellate courts have not yet imposed liability for mere negligence in private actions under rule 10b–5. Language embracing a negligence standard, or a standard less stringent than one of actual knowledge or reckless disregard for the truth, has in every instance been used in cases where the defendant's conduct was clearly violative of a higher standard, in cases arising on a motion to dismiss or in cases in which the court found an alternative reason to find no liability. In those few cases where defendant's conduct might be said to constitute negligent behavior, but not knowing or reckless behavior, no liability has been found. (footnotes omitted)

*Bucklo, Scienter* and Rule 10b–5, 67 Nw.U.L.Rev. 562, 590 (1972).[97]

---

**97.** Recent decisions of the Supreme Court applying Rule 10b–5 have stressed the "fraud or deceit" aspects of the Rule and have all involved active participants in the fraud. In SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), the defendants in their Investment Service recommended certain securities for purchase, knowing that their recommendation would cause the securities to advance in price. They then, prior to publication of their Service, bought these same securities for their own account. After the price increase had been achieved, they sold the securities at a profit. The defendants were active participants in the scheme. In Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), the defendants held liable were actively involved in the fraudulent scheme which resulted in the purchase of Manhattan's stock out of its own assets. As the Supreme Court said, "The crux of the present case is that Manhattan [Casualty Co.] suffered an injury as a result of deceptive practices touching its sale of securities as an investor." 404 U.S. at 12–13, 92 S.Ct. at 169. Finally, in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the Court held liable individual defendants who, as bank employees, were actual participants in inducing sales of stock without disclosing material facts

 In sum, we believe that proof of a willful or reckless disregard for the truth is necessary to establish liability under Rule 10b-5.[98] Applying this standard to the record before us, we are unable to conclude that Coleman willfully closed his eyes to or turned his back on the fraudulent nature of the BarChris-Victor Billiard negotiations. On the contrary, Coleman, displaying an attitude not ordinarily found in outside directors, *see* M. Mace, Directors: Myth and Reality 186-88 (1971), played an active and concerned role in BarChris's affairs. In August, 1961, he sought an explanation from Kircher for the revised earnings statement. On Coleman's initiative, the board of directors required a review by counsel of all press releases issued after the October 13th statement, "Important Report to the Financial Community." And it was Coleman who suggested hiring an outside management consultant after the December 6 point-of-crisis meeting, even after Kircher, in whom he placed great confidence, had given his personal assurance that BarChris did not have any unweatherable problems. A director may have an obligation to maintain an awareness of significant corporate developments and to consider any material, adverse developments which come to his attention. But Coleman, in our view, more than met this standard of responsibility and his failure to discover the true nature of Kircher's negotiations with the Lanzas cannot be characterized as willful or reckless.

E. *Sound Policy Supports the Conclusion that Rule 10b-5 Should Not Be Read to Impose a Duty to Convey*

As Professor Bishop has noted, "[t]here seems to be a general consensus that outside directors—*i. e.*, directors who are not full-time employees of the corporation—are desirable." [99] A survey in 1966 of 456 manufacturing companies showed that only six had no outside directors; in two-thirds of the companies surveyed, outside directors constituted a majority of the boards of directors.[100]

The consensus as to the proper role of these non-officer directors is that they should supervise the performance of the management.[101] Such supervision necessarily involves balancing a skepticism towards management's assessment of its performance and a trust in the integrity and competence of management.

The SEC has observed in its *amicus* brief:

Corporate directors are not normally involved in the day-to-day conduct of the company's affairs. Except in unusual circumstances, they are not expected to, nor do they, participate directly in the implementation of corporate policies. Routine managerial tasks are performed by, and are the responsibility of, the operating officers. Directors have a right to rely on the officers of the corporation to perform their functions in a lawful manner.[102]

which could have been expected to influence the sellers' decisions to sell.

98. In determining was constitutes "willful or reckless disregard for the truth" the inquiry normally will be to determine whether the defendants knew the material facts misstated or omitted, or failed or refused, after being put on notice of a possible material failure of disclosure, to apprise themselves of the facts where they could have done so without any extraordinary effort. Chris Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 363-364, 396-399 (2d Cir. 1973). The answer to the inquiry will of course depend upon the circumstances of the par-

ticular case, including the nature and duties of the corporate positions held by the defendants.

99. Bishop, Sitting Ducks and Decoy Ducks: New Trends in the Indemnification of Corporate Directors and Officers, 77 Yale L.J. 1078, 1092 (1968).

100. *Id.*, citing J. Bacon, Corporate Directorship Practices 6 (Nat'l Indus. Conference Bd. 1967).

101. Bishop, *supra* note 99, at 1092-93. In addition, of course, they should establish objectives for management to achieve.

102. Brief for SEC as *Amicus Curiae* at 5. The SEC urges us to remand the case to

The observations of Professor, now Justice, Douglas and Professor Bates are also to be noted:

[T]here are a great many [directors], particularly of the larger and more complicated enterprises, who do [actively direct] and yet are not personally familiar with all details of operation. Nor could their services be obtained in most cases if they were required to investigate details of the enterprise. The experience and judgment of men of affairs is of great value to most of our more important corporations. To deprive enterprises of this asset would seem uneconomic in view of the slight gains which may be expected.[103]

As Judge Frankel said below:

As in all lawsuits, we deal in the sometimes unreal certainties of hindsight. When we move toward the kind of novelty plaintiffs propose for one in the position of Coleman, it may not be amiss to recall the ambiguities of real life. A director like Coleman, not involved in the daily business, may think he "knows" things contrary to what he is told by the management upon which he must perforce rely. He may be wrong. His primary loyalties are familiar and stern ones. How and when he must—or may—run off to "warn" or advise outsiders dealing with his corporation could suggest questions of great refinement. At the very least, such action would violate the decorum of the management hierarchy; at most, it could cost him his seat on the board and a judgment for interfering with a corporate opportunity. If people of stature and creative potential are still wanted for corporate directorships, we must take care how agonizingly subtle their choices are to be. . . . In short, if the type of liability plaintiffs urge should ever be imposed, it ought to be reasonably clear that the wrong is palpable and that the balance of advantage lies in that course.[104]

As a practical matter, what should Coleman have done and said when the concluded Victor-BarChris stock exchange was presented to the board for approval?

Consider for a moment the practical aspects: Should Coleman have said: "Hold up all further proceedings. Disregard the closing date. I must personally examine all participants in this transaction from July to date—all Victor representatives and all BarChris representatives—as to all things said and done with respect to the exchange and no vote on my part can be made until I satisfy myself that all figures and representations are accurate." Even if he had told the Victor shareholders that BarChris' financial situation was bad and that there was dissension in the board, he might well have subjected himself to criticism. Furthermore, if this were Coleman's duty, so was it the duty of all directors to quiz all participants as to their knowledge; establish-

---

Judge Frankel for further findings of fact on whether Coleman had reason to believe that a misleading picture of BarChris's affairs was being conveyed to plaintiffs. We reject the position implicit in this request that a director owes a duty of diligence to prospective purchasers to insure that all material, adverse information is conveyed to such purchasers, and therefore deny the Commission's request.

103. Douglas & Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 195 (1933) (footnotes omitted).

104. Lanza, supra note 1, at 90,105 n. 18. See Folk, supra note 45, at 70, 75 (discussing a director's § 11 duties):

[V]erification should be expected of any director if he has reasonable suspicions concerning the integrity of the officers, or if their representations conflict with facts he knows or documents he is familiar with, or are self-contradictory or inconsistent with statements of other responsible persons.

\* \* \* \* \*

[A] general verification requirement for directors would be difficult to define, unpleasant to administer, and in some instances unfair in result.

ing such a duty would create an intolerable situation.

As to the deterioration of the BarChris picture: the company had prospered under the initial impetus of the bonanza of leisure-time activities. At that time it was thought that a large segment of the population would retire early, on adequate pensions, and that those who actually did work would have three- or four-day work weeks with four or five hours of work each day. With all this leisure time available some sort of activity would have to be found to while away the time. What better way than bowling, boating, skiing, etc.? Thus spake the boosters of companies engaged in these areas. And bowling alleys did mushroom all over the country. But as in many other economic fields, over-expansion may produce a reaction which can manifest itself in bowling alleys as well as in potato and wheat productions. In short, there are good years and bad years even as in Biblical days. And depending upon the psychological make-up of the individual, there will always be prophets of doom as well as boom.

Almost every corporation has its good periods and bad periods. When the market for its products and its earnings are good, its stock is likely to sell at levels higher than when the contrary situation prevails. One director might believe that the recession in the bowling alley business was temporary; others the opposite. The corporate minutes might well reflect the disagreement. Is the director who predicted lower earnings to be held liable to purchasers of the company's stock for failure to announce his views (possibly minority views) to potential purchasers at public or private sale in the event the stock

should go down in value in the future? The very question ought to supply the answer. If not, then a review of the financial history of hundreds of corporations over the last few years will, whether the corporations be in the nursing home business, the manufacture of leisure time products, merchandising activities, etc. Even the natural resources fields, such as oil, minerals, and paper, have not been impervious to wide fluctuations. In many cases questionable management has been replaced or improved. To hold individual, nonofficer directors personally liable for fraud by officers in their corporate negotiations was never the intendment, Congressional or otherwise, of Section 10(b) of the 1934 Act nor of Rule 10b–5.

Coleman should not be forced under legal edict to hold himself out publicly as a prophet or a modern Cassandra. His own views as to the company's prospects, expressed or unexpressed, should not be made the basis for legal liability. Actually any prophecies of doom would have misrepresented Coleman's own views and, had the Victor transaction failed because of any such misrepresentations, it could easily have resulted in suits which would have found Coleman liable to both Victor and BarChris.

In this action penalties have been visited upon those meriting them. The District Court has held liable those who made false representations. He has exonerated those who were not participants. In so doing, he has fulfilled the function of a Judge, which is to serve justice.

Congress was quite aware of the "agonizingly subtle" choices continually facing directors when it passed the securities acts.[105] As President Roosevelt

105. State legislatures apparently were equally aware. State blue sky laws universally exempt directors from liability for fraud perpetrated by corporate officers unless the directors are in some meaningful sense culpable participants in the fraud. There are generally two types of statutes. First, there are those modelled

after § 410(b) of the Uniform Securities Act (as amended 1958) (7 Uniform Laws Ann. 691, 770–71 (1970)):

Every . . . director of such a seller [who, *inter alia*, offers or sells a security by means of an untrue statement of material fact, etc. . . .] . . . [is] also liable jointly and severally with

made clear in his message to Congress and as the committee reports attest, duties were to be imposed upon directors for the protection of the public "with the least possible interference to honest business."

Congress chose to impose upon directors through Section 11 of the 1933 Act a duty to insure that all material, adverse information is conveyed to prospective purchasers of the company's stock. The history of the section demonstrates that the matter was carefully considered and the duties were precisely defined. To argue that a section of the 1934 Act, which neither by its terms nor its history manifests a similar attention to the careful balance struck in Section 11, and which would impose upon directors the same duties as Section 11 and more, is to thwart, not serve, the purpose of Congress and the dictates of sound policy: "To impose a greater responsibility [than that imposed by Sec-

tions 11 and 12] . . . would unnecessarily restrain the conscientious administration of honest business with no compensating advantage to the public." [106]

We conclude that Coleman in his capacity as director and as a non-participant in the transaction owed no duty to insure that all material, adverse information was conveyed to prospective purchasers of BarChris stock. Because Coleman owed no duty as a director to convey to plaintiffs information not conveyed to them by Kircher et al., and because Coleman was not an aider and abettor of, a conspirator in, or a substantial participant in the fraud perpetrated upon these plaintiffs, the complaint against Coleman and Drexel & Co. was properly dismissed.

### Kircher's Demand for a Jury Trial [107]

Appellant Kircher appeals the denial of his demand for a trial by jury follow-

---

and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

Notice that there is no affirmative duty of investigation. See Ala.Code tit. 53, § 45(2)(b) (Supp.1971) ; Alaska Stat. § 45.55.220(c) (1962) ; Ark.Stat.Ann. § 67–1256(b) (1966) ; Cal.Corp.Code § 25504 (West Supp.1973) ; Col.Rev.Stat. § 125–1–21(2) (1963) ; Conn.Gen.Stat. Ann. § 36–346(b) (1969) ; D.C.Code Ann. § 2–2413(b) (1967) ; Idaho Code § 30–1446(2) (1967) ; Ind.Stat.Ann. § 23–2–1–19(b) (Burns Code ed. 1972) ; Kan. Stat.Ann. § 17–1268(b) (Supp.1972) ; Ky.Rev.Stat.Ann. § 292.480(2) (Supp. 1972) ; La.Rev.Stat. § 51:715B (West Supp.1973) ; Md.Ann.Code art. 32A, § 34 (b) (1967) ; Mich.Comp.Laws Ann. § 451.810(b) (1967) ; Mo.Ann.Stat. § 409.-411(b) (Supp.1973) ; Mont.Rev.Code Ann. § 15–2022(2) (1967) ; Neb.Rev. Stat. § 8–1118(2) (1970) ; N.J.Stat.Ann. § 49:3–71(b) (1970) ; Ore.Rev. Stat. § 59.115(3) (1971) ; S.C.Code § 62–310 (1962) ; Utah Code Ann. § 61–1–22(2) (1968) ; Va.Code § 13.1–522(b) (1973) ; Wash.Rev.Code Ann. § 21.20.430 (2) (Supp.1972) ; Wis.Stat.Ann. § 551.-59(4) (Supp.1973) ; Wyo.Stat.Ann. § 17–117.22(b) (1965).

The second general type of statute exempts the director unless he "participates" or "personally participates" in the violation. See Fla.Stat.Ann. § 517.21(1) (1962) ; Ga.Code Ann. § 97–114 (1968) ; Hawaii Rev.Stat. § 485–20(a) (1968) ; Ill.Ann.Stat. ch. 121½, § 137.13A (Smith-Hurd 1960) ; Iowa Code Ann. § 502.23 (1949) (participation must be knowing) ; N.Mex.Stat.Ann. § 48–18–31 (1966) ; N.C.Gen.Stat. § 78–22 (1965) ; N.Dak.Century Code § 10–04–17 (1960) ; Okla.Stat.Ann. tit. 71, § 408(b) (1965) ; S.Dak.Comp.Laws Ann. § 47–31–133 (1969) ; Tenn.Code Ann. § 48–1645 (1964).

New York, Delaware, and the Model Business Corporation Act specifically sanction good faith reliance by directors on financial statements of the corporation represented to them to be correct by the president, controller, or a public accountant. Del.Code Ann. tit. 8 § 141(e) (Supp.1970) ; N.Y.Bus.Corp.Law § 717 (McKinney 1963). See ABA–ALI Model Bus.Corp.Act § 48(c) (West 1971).

106. H.R.Rep.No. 85, 73d Cong., 1st Sess. 10 (1933). See also a discerning analysis of the business and legal problems facing the outside director in Blough, The Outside Director at Work on the Board, 28 Record of N.Y.C.B.A. 202 (1973).

107. See note 4, *supra*.

ing an initial waiver of that right. The original complaint, filed November 23, 1964, alleged that defendants had violated Section 10(b) and Rule 10b–5; it contained no demand for a jury trial. Defendant Kircher did not make a timely demand for a jury trial, and his failure to do so constituted a waiver of the right to a trial by jury. Fed.R.Civ.P. 38(d). On November 10, 1966, the court granted plaintiffs leave to file an amended complaint which specifically alleged that the May, 1961, prospectus was false on the date of issuance. Within ten days of the filing of the amended complaint Kircher filed a demand for a jury trial. In May, 1967, Kircher moved for an order transferring the case from the non-jury to the jury calendar "pursuant to timely demand. . . ." The motion was denied on the ground that plaintiffs' "amendment did not introduce a new issue or change the nature of the action." In April, 1969, plaintiffs further amended the complaint to allege that the defendants' conduct violated Section 17(a) of the Securities Act of 1933 and to demand punitive damages. Kircher then filed an answer demanding a jury trial. On May 29, 1969, Kircher again applied for a jury trial; the district court denied the application. At the opening of trial, Kircher moved to reargue the latest denial, and his motion was denied.

■ Under Rule 38(d), the failure to demand a jury trial within the period designated by Rule 38(b) constitutes a waiver of that right as to all issues raised in the complaint. If the original complaint is subsequently amended, the right to demand a jury trial is revived in an action such as this only if the amendment changes the issues. Western Geophysical Co. of America, Inc. v. Bolt Associates, Inc., 440 F.2d 765, 769 (2d Cir. 1971). Appellant Kircher claims that the amendments alleging violation of Section 17(a) and claiming punitive damages raised for the first time the issues of the falsity of the May, 1961, prospectus as of the date of issuance and the willfulness of Kircher's conduct.[108]

■ The amendments did not raise new issues within the meaning of Rule 38 such as would entitle Kircher to demand a jury trial as of right. The case involved, and the original complaint raised, one basic issue: Whether plaintiffs were fraudulently induced to exchange their Victor stock. Kircher's failure to demand a jury trial waived his right as to all issues relating to this general area of dispute. The amendment added no new issues: the same conduct and the same allegedly false documents constituted the basis for any claim under Rule 10b–5, Section 17(a), or common law fraud. The willfulness and falsity as of a particular date merely clarified "the same general issues" raised in the original complaint. Moore v. United States, 196 F.2d 906, 908 (5th Cir. 1952). Kircher had been put on notice of the underlying facts and basic legal theory—fraud—upon which plaintiffs sought relief, and the character of the suit was in no way changed by the amendments.

Even assuming, however, that the issues of willfulness and falsity as of a particular date might have been "new" had they not been alleged in the original complaint, we think that complaint is sufficiently broad to be fairly construed as including both these issues. The

---

108. Contrary to Kircher's assertions, none of the complaints alleges claims for relief for common law fraud or prima facie tort under New York law. These theories of recovery were apparently suggested to Judge Frankel in a post-trial memorandum. The question of whether Kircher could have demanded a trial by jury as of right, if the amendments specifically alleged the legal conclusion that plaintiffs could recover under a theory of prima facie tort, is moot since Kircher was not found liable on that ground. The second amendment to the complaint alleged defendants' willfulness; there is no specific allegation of common law fraud. The allegation of willfulness was apparently included as the basis for the prayer for punitive damages.

original complaint specifically charging fraudulent conspiracy put in issue the willfulness of all the defendants' actions surrounding the acquisition of the Victor stock. The original complaint also specifically alleged that plaintiffs were given "a Prospectus dated May 16, 1961," and two paragraphs later, that the "aforesaid representations and financial statements, releases, reports, brochures, and documents were materially false *at the time they were made*" (emphasis added). In view of the breadth of these allegations, we agree with Judge Frankel that the issues were raised in the original complaint and the right to a jury trial waived.

The judgment is affirmed.

HAYS, Circuit Judge, concurring in part and dissenting in part in separate opinion with whom J. JOSEPH SMITH, OAKES and TIMBERS, Circuit Judges concur.

TIMBERS, Circuit Judge concurring in part and dissenting in part in separate opinion with whom OAKES, Circuit Judge also concurs.

HAYS, Circuit Judge (concurring in part and dissenting in part):

I concur in the denial of appellant Kircher's motion for a jury trial. I dissent on the issue of the liability of Bertram D. Coleman and Drexel & Co. I believe that Coleman's conduct with respect to the sale of BarChris stock was a violation of § 10(b) and Rule 10b–5 and that Coleman and Drexel should be held liable for the damages sustained by the plaintiffs.

I. *Factual Background*

A. Coleman's Initial Involvement with BarChris

Defendant Coleman was a partner of Drexel & Co., a brokerage and investment banking firm located in Philadelphia. Drexel was the principal underwriter of the 1961 public sale of the BarChris debentures at issue in Escott v. BarChris Const. Corp., 283 F.Supp. 643 (S.D.N.Y.1968). In April, 1961, after Drexel had decided to underwrite BarChris's debenture offering, Coleman became a director of BarChris. Drexel wanted to have one of its partners in a position to oversee the activities of a company in which Drexel was going to make a substantial investment. Coleman remained on BarChris's board of directors until March 22, 1962, when he resigned. He returned as chairman of the board in May, 1962, and resigned again in October, 1962, after BarChris instituted bankruptcy proceedings.

In late 1960 a representative of BarChris approached Drexel seeking financial advice. Alternative types of financing were discussed, and Drexel then sought preliminary information about the bowling industry in general and BarChris in particular. The record discloses that during this initial contact between Drexel and BarChris, Coleman was one of two or three Drexel representatives who discussed the financing with BarChris's representatives, Russo, Kircher, and Vitolo. Coleman was apparently the senior Drexel representative involved in the BarChris financing. Drexel decided to underwrite the financing in early 1961,[1] and Coleman was made a member of BarChris's board of directors in April of that year. The district court's finding that Coleman, in assuming a BarChris directorship, was acting on behalf of Drexel, is not challenged on this appeal.

The registration statement covering the BarChris issue of debentures was filed with the Securities and Exchange Commission in March, 1961, and became effective on May 16. In *Escott*, the court found the prospectus contained in the registration statement to be false and misleading in the following respects:

(A) Unfilled Orders on the books of BarChris as of March 31, 1961 were overstated by $4,490,000 or more.

---

1. Escott v. BarChris Construction Corp., *supra*, at 693.

(B) The statement that since 1955, BarChris had been required to repurchase less than ½ of 1% of customers' promissory notes discounted with unaffiliated financial institutions, was incomplete and inaccurate as of May 16, 1961, in that it did not disclose that:

(1) the primary obligors of notes of Dreyfuss Bowling Enterprises, Inc., Federal, 947 Bowling Corp. and Stratford Lanes, Inc. that had been discounted by BarChris with James Talcott, Inc. had prior to May 16, 1961, defaulted or were delinquent in the payment of their obligations; and

(2) as of May 16, 1961, it had been the practice of James Talcott, Inc. to require the repurchase of notes discounted with it that were in default.

(C) The Prospectus does not disclose the following with respect to the description of BarChris's business as of May 16, 1961:

(1) that BarChris intended to operate Bridge Lanes, Yonkers Lanes and Woonsocket Bowl; and

(2) that BarChris contemplated operating Harlem Lanes, Stratford Bowl, Leader Lanes, Federal Lanes and Hart Lanes.

(D) The statement of Application of Proceeds is inaccurate and incomplete as of May 16, 1961 in that:

(1) the net proceeds of the debenture offering are totally allocated in the Prospectus to construction of a new plant, development of a new equipment line, a loan to BarChris Financial Corporation and additional working capital, and it did not disclose that BarChris intended to apply at least 60% of the proceeds allocated to additional working capital, to the repayment of prior debts and other commitments;

(2) BarChris intended to use approximately $1,187,736 of the net proceeds of the debenture offering for the payment of prior debts ($1,067,736) and other commitments ($120,000), namely:

(a) for payment of checks drawn against BarChris's account with Lafayette National Bank, which amounted to $825,736 as of May 31, 1961;

(b) for payment of $242,000 borrowed from the Manufacturers Trust Company; and

(c) for a loan of $120,000 to St. Ann's, Inc.[2]

B. The Victor Acquisition

Frank Lanza, Jr., met BarChris representatives at a trade meeting in March, 1961 and inquiries were made concerning a possible acquisition of Victor by BarChris. Victor was interested in the prospect of receiving manufacturing space and additional capital from BarChris, and BarChris was interested in diversification, believing that billiard tables would be a suitable complement to the recreational facilities of the bowling alleys it constructed. On July 28, 1961, the first of five formal meetings between representatives of BarChris and Victor was held to negotiate the terms of the exchange. Kircher represented BarChris at all these meetings. The representative and negotiator for the Victor shareholders was Sidney Shulman, who was present at all five meetings. Shulman had been Victor's accountant for a number of years and had been retained to represent the Victor shareholders in the negotiations.

At the July 28 meeting, Kircher gave Shulman a copy of the false and mis-

2. In the instant action Judge Frankel ruled that the defendants were collaterally estopped from contesting these findings, a ruling that is not challenged on this appeal.

leading May 1961 prospectus, as well as an unaudited six-month earnings statement. Kircher asserted that BarChris's earnings per share would be $1 by the end of 1961. During the second meeting on August 3, Kircher told Shulman that BarChris's backlog of unfilled orders amounted to between $6,000,000 and $7,000,000. The district court's finding that this figure was a "gross overstatement" is not challenged on this appeal.

On August 17, Shulman was sent copies of BarChris's six-month financial statement and 1960 annual report. The district court found that these documents contained some of the same misstatements and omissions as the May 1961 prospectus;[3] that the six-month statement made additional misrepresentations;[4] and that the "enthusiastic reference" in the annual report of BarChris's construction projects and plans in Europe "was seriously misleading."

Two more meetings, on August 27 and November 3, were held to complete the negotiations and to draft the exchange agreement. The terms of that agreement provided that the Victor shareholders would exchange their shares for $250,000 of BarChris stock, that Clara Lanza would receive $10,000 in cash, and that the Victor managers would be employed by BarChris and would participate in the BarChris pension plan. Because the BarChris shares to be exchanged were not covered by a registration statement, the contract further provided that the Victor shareholders could elect by March 1962 to have BarChris file a registration statement covering those shares that the new shareholders desired to sell. The BarChris board of directors approved the acquisition on November 21. The contract was signed on November 27, and the closing took place on December 14, 1961.[5]

3. "(1) The 1960 sales figure was overstated by $653,900.

(2) The figure for 1960 net operating income was stated to be $1,746,347 whereas it should have been $1,496,196.

(3) The figure for total current assets was stated to be $4,581,963; it should have been $3,914,332.

(4) The figure for contingent liability on the alternative method of financing (sale-leaseback) as of December 13, 1960, was stated to be $750,000. An additional $457,045 should have been included relating to Asbury Lanes and Torrington Lanes. The sum of $81,250 relating to Capitol Lanes should not have been included because this was a direct liability of BarChris, not contingent. The contingent liability figure, after these additions and subtractions, was understated by $375,795."

4. "(1) As with the annual report and the prospectus, the net sales and gross profit figures in the earnings statement were overstated.

(2) Current assets were overstated in the balance sheet because there was a grossly inadequate reserve in accounts receivable against customers' defaults. This is true even if we accept, as the court does, that this is a matter on which there is latitude for variable accounting judgments. The purported judgment reflected in the BarChris six-month statement is well below any arguable lower limit.

(3) The earnings statement showed an operating income of $617,229. This figure was overstated, again because of the inadequate reserve against customer defaults. Similarly lacking was a reserve for notes on which BarChris was contingently liable.

(4) The statement of net earnings (listed as $237,007) and the earnings per share figure (20 cents per share) were grossly inflated. If the undisclosed adverse circumstances had been taken into account, the earnings for the period would have been sharply reduced or erased.

(5) The financial statement told about some non-consolidated subsidiaries (note 1), but failed entirely to mention other such subsidiaries which had been set up to operate repossessed bowling centers or alleys built "on speculation" and never sold.

(6) The financial statement was misleading in that a substantial amount of customers' notes were already past due, thus increasing the possibility that BarChris would become directly liable if the customers defaulted."

The district court also found that at the November 3 meeting Kircher orally represented that BarChris's financial situation would be better than that for the previous year.

5. The number of shares received by plaintiffs was arrived at by dividing $250,000 by the mean value of the BarChris stock for 30 days prior to the closing.

C. Developments Within BarChris from May to December 1961

During the second half of 1961 BarChris experienced serious business reversals as well as intracorporate discord over managerial deficiencies in the operation of the business. BarChris's techniques of financing the construction of bowling alleys relied heavily on the financial success of the alleys to enable the operators to meet lease or note payments. The failure of some of the alleys forced BarChris to assume control and to attempt to operate them profitably. Prospects, despite some large orders, were not as rosy as BarChris's representatives had lead Shulman and plaintiffs to believe. The district court found that the following developments were not disclosed to plaintiffs.

"(1) Hart Lanes and Linden Lanes were at least six months delinquent in their payments as of November, 1961. The existence of this situation had been omitted from the prospectus, rendering false and misleading its statement that since 1955 BarChris had been required to repurchase only one-half of 1% of its customers' promissory notes. The continued and growing rate of repurchases due to delinquencies was concealed from the plaintiffs.

(2) Talcott advised BarChris in April, 1961, that it would not make any new purchases of notes or other obligations of BarChris's customers; Talcott maintained that position thereafter.

(3) Plaintiffs were not told that prior to the closing in 1961, BarChris was operating at least eight bowling centers and that all of these were operating at a loss. The operation of bowling alleys by BarChris was concealed throughout the negotiations with Shulman. The omission of any reserves for contingent liabilities and the inclusion of a reserve for the Stratford bankruptcy gave the false and misleading impression that Stratford was the only facility which was in trouble and likely to be taken over by BarChris. In fact, BarChris was faced during the early period of negotiations with a substantial prospect that it would have to take over operation of a number of other bowling alleys; that prospect materialized well before the closing with the Lanzas, but nothing was ever said to correct the misleading impressions conveyed by the documents given to Shulman.

(4) It was also undisclosed that BarChris was attempting to sell and lease back two parcels of real estate in order to obtain much-needed working capital and that the estimated earnings figure of $1 per share for 1961 depended in large measure on the completion of such sales and leasebacks by the end of that year.

(5) Neither plaintiffs nor their representatives were told that some time after May, 1961, Pugliese loaned BarChris $90,000 or $100,000. Nor was it disclosed that early in December, 1961, Russo and Vitolo loaned the company $48,000 and $50,000, respectively. These non-disclosures were especially deceptive since the prospectus had stated that during the three years ending February 28, 1961, the officers of BarChris had made advances to the company totalling $155,615 and that all such advances had been repaid. As of the date of the prospectus the actual advances were $430,615, of which only $4,000 had been repaid. Deepening the earlier deception via the prospectus, the later non-disclosures concealed the very poor cash position of BarChris.

(6) Neither plaintiffs nor Shulman learned at any time before the closing that the BarChris general ledger relating to its accounts with its banks showed negative cash balances on or about November 30, 1961, totalling over $600,000. The largest among these was the negative balance in the ledger account for Lafayette National Bank of $442,234.64 representing checks drawn but not cashed beyond the $119,490.60 balance shown on that bank's statement."

Despite these adverse business developments, six press releases and reports were issued by BarChris, the context of which varied from questionable optimism to downright misrepresentation.[6]

The intracorporate conflicts and criticisms peaked in December. On November 30, Vitolo announced that he intended to resign the presidency of BarChris; the board was considering Russo to fill that post. On December 6, at a special meeting of the board of directors, at which Coleman was present, Kircher presented a statement, endorsed by two other officers, Birnbaum and Trilling, which contained the following:

> "It is our considered judgment that Mr. Russo has been thrust into the position of being considered for [the presidency of the company] as a result of management's refusal to recognize, evaluate and solve the underlying management problem, rather than being positively chosen on the basis of the recognition that he possesses the capabilities required to serve in this office. On this premise we cannot, in good conscience, concur with any recommendation which would permit him to exercise the powers and responsibilities of the office of chief executive.
>
> One might say that the success of BarChris to date belies any weakness in management. On the contrary, the success of the Company and its rapid expansion as a result of a booming industry have contributed to concealing these weaknesses, which only now begin to show up when the industry is losing its explosive growth, competition is becoming keener and earnings

begin to wane. Such factors as low down payments, poor credit risks, high financing costs, poorly written contracts, improper documentation, inadequate cost estimation and the like, which, when they appear in a booming industry, tend to be lost in the shuffle, take on a different light in today's market. We make no criticism of occasional errors of judgment, which result in losses or excessive costs. However, when a consistent pattern of organizational laxity and faulty judgment become apparent, we believe that management must appraise the situation and initiate such action as is deemed necessary in the circumstances to correct the deficiencies noted.

> Some of the past mistakes that have recently come to light and have damaged or may damage the Company include the practice of the execution by Mr. Russo of legal documents without legal representation. Of a number of examples, one which was recently brought to the attention of the Board of Directors was Stratford Bowl, in which case an improperly executed document resulted in the Company losing its position as a secured creditor in a bankruptcy proceeding and resulting in the exposure to substantial loss. This lack of legal representation has resulted in improper filings and other deficiencies which placed the Company in an unsecured position as against any Trustee in Bankruptcy in situations having an aggregate value in excess of $1,000,000. Fortunately, the former condition was resolved with a minimal loss to the Company, and the

6. The following reports were issued:
 June 20, 1961: Letter to Shareholders
 July 19, 1961: "Record Sales and Earnings Reported by BarChris for First Six months"
 August 2, 1961: "BarChris Issues Explanation of Revised Six Months Statement"
 October 3, 1961: "An Important Report to the Financial Community"
 October 31, 1961: "BarChris Reports Record Sales, Earnings for Nine Months Ended September 30"

 November 22, 1961: "BarChris Declares 4% Stock Dividend"
 Plaintiffs admit that they neither saw nor relied upon these documents. The district court held that as plaintiffs' claims for damages were based on the amount they paid to the trustee for the return of the stock, not the market price of BarChris stock which might have been artificially raised by the statements in these reports, plaintiffs could not base their damage claim on misrepresentations in documents they never saw.

latter condition has been substantially remedied through the efforts of our legal department. This same lack of legal representation has contributed to the signing of a turnkey contract—Bridge Lanes—where an underlying lease precludes financing of the $400,000 interior package, because of provisions in the lease which prohibit the filing of chattel mortgages, conditional bills of sale or bailment leases, which are the instruments through which such sales are financed."

[There follows a description of specific instances of what were alleged to be serious mistakes in the management, particularly by Russo, of various aspects of the business. Kircher then continued:]

"The weaknesses of BarChris are the result of a lack of strong, effective leadership. Some symptoms of this basic problem are evidenced by the following conditions:

1. Refusal to accept the fact that basic problems exist within the Company;

2. The acceptance of the thought that all of the Company's ills can be cured by additional cash coming into the Company;

3. The inability of top management to make prompt decisions which results in confusion and lack of accomplishments at lower echelons;

4. The complete lack of long-range planning;

5. The excessive concern over the price of the Company's stock and the tendency to make decisions based upon the reaction of the stock market to such decisions.

We feel that BarChris is at a point of crisis. This crisis cannot be solved by wishful thinking of [sic] the perpetuation of ineffective leadership. The Board of Directors must exercise its responsibilities by recognizing the management's inability to cope with the existing problem, and must take such action as it considers necessary to prevent the continuation of ineffective leadership which ultimately can only result in substantial damage to the Company and its stockholders."

It is to be noted that this statement was made at the board meeting of December 6, eight days before the closing of the Victor transaction. The plaintiffs were never informed of the conditions revealed by the statement or of the existence of strife within the Company. Coleman made no attempt to ascertain whether these matters had been or would be disclosed to plaintiffs.

II. *The Decision of the District Court*

The district court held that plaintiffs were fraudulently induced by various misstatements and by failure to disclose material facts to exchange their Victor stock for that of BarChris, and it would be difficult to find a record more replete with evidence of such fraud. Indeed the fraudulent nature of the transaction is not challenged on this appeal. The issue on appeal is the determination of who is liable for the fraud. The district court held that Vitolo, Russo, and Kircher were liable under § 10(b) and Rule 10b–5, § 20(a),[7] and the doctrine of common law fraud; that Pugliese was not liable under § 10(b) and Rule 10b–5 and that he had established a "good faith" defense to the imposition of liability under § 20(a). The court further held that plaintiffs had not established that there was a conspiracy among Pugliese, Friedman, and Ballard to deceive plaintiffs after the December 14 exchange so as to delay their action for rescission. These holdings are not challenged.

The district court found—and the majority affirms—that Coleman and Drexel were not liable for the misrepresentations and omissions of the BarChris management in their information to the Victor shareholders. The district court's ruling was based upon two conclusions, one of fact and one of law. The plaintiffs argued below that Cole-

---

7. Securities Exchange Act of 1934 § 20(a), 15 U.S.C. § 78t(a) (1970).

man knew or should have known that misstatements and omissions to state material facts about BarChris's business and financial position had characterized the information disseminated by corporate officials to the public, that Coleman nevertheless voted to approve the Victor acquisition, and that Coleman is liable because he did not advise plaintiffs, or see to it that they were advised, of BarChris's true position. The district court found as a matter of fact that "Coleman neither participated in nor knew of any deception practiced upon the plaintiffs . . . ." The record clearly shows that Coleman made no affirmative misstatements to plaintiffs or to Shulman. As for the facts surrounding the negotiations of the exchange, as the majority opinion notes, the district court found:

> "Coleman was not aware or even suspicious that plaintiffs were being deceived during the negotiations with Kircher. At least until after the closing, he had no knowledge or belief that any hard figures published by BarChris were false or misleading. He knew of some negative developments—of customer defaults, declining new orders and the stringent cash situation. He came to know, too, a week or so before the closing, that there was dissension among the officers. He had no reason to suspect that Kircher had not disclosed all these facts to plaintiffs. . . ."

The district court concluded that Coleman's inquiries and investigations were sufficient as a matter of law to satisfy the requirements of § 10(b) and Rule 10b–5.

> [Coleman] was under no duty to investigate more than he did at the material times or to seek out and advise the plaintiffs in any way.

In addition, the district court found that Coleman was a "controlling person" within the meaning of § 20(a) of the 1934 Act, but that he had established a good faith defense to the imposition of liability for the acts of the other defendants.

## III. *Liability Under Section 10(b), Rule 10b–5, and Section 20(a)*

The question presented to this *en banc* court is whether the director of a corporation should be liable to the purchasers of that corporation's shares when he fails to make any inquiry about the actions of his co-directors and the Company's officers with respect to the representations made in connection with the sale of stock.

It is not profitable in considering a case such as this merely to characterize the allegedly unlawful conduct as either negligent or wilful and to impose liability only if the conduct was wilful. Neither the Act nor the Rule creates such a simple dichotomy. The purposes of the Act and the Rule are not furthered by a mechanical application of labels. The relationship of the parties and the transaction involved must be analyzed in order to determine whether the Act and the Rule impose a duty on one party with respect to the other and the nature of that duty. In making this analysis Section 10(b) and Rule 10b–5 "must be read flexibly, not technically and restrictively" so as to further Congress's broad remedial purpose in enacting the statute. Superintendent of Insurance of the State of New York v. Bankers Life and Casualty Co., 404 U.S. 12, 92 S.Ct. 169 (1971).

Section 10(b) and Rule 10b–5 imposed upon Coleman, as a member of the board of directors of the corporation selling the securities, a duty toward these plaintiffs. Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964); Schoenbaum v. Firstbrook, 405 F.2d 215 (2d Cir. 1968) (en banc), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). These provisions impose upon a director of a corporation that is selling its shares the obligation not to defraud the purchaser by either misstating or omitting to state material facts. A director cannot escape that duty by failing to inform himself

of the facts and developments relevant to the sale of securities.

Coleman was added to the BarChris board at the behest of Drexel. His assignment was to oversee BarChris's business and financial operations with a view to protecting Drexel's substantial investment in BarChris securities. The fact that Drexel had a representative on the board was important to these plaintiffs. The district court found that "Coleman was a respected and weighty member of the BarChris board" and that he was a "controlling person" within the meaning of § 20(a). He was probably the most sophisticated member of the board in terms of financial and business experience. As a director Coleman had voted for the acquisition of the Victor stock. During the negotiation period Coleman knew that BarChris had experienced reverses. He learned at the "point of crisis" meeting, *eight days before the closing,* of the details of BarChris's unfavorable position and of the intracorporate dissension.

Despite Coleman's experience, important corporate position, and knowledge of corporate adversity, he made no attempt to inquire as to the course of the negotiations Kircher was conducting with plaintiffs and Shulman or as to the information about BarChris being conveyed to the Victor shareholders on which the negotiations were based. He did not inquire at the "point of crisis" meeting or subsequent thereto, whether the Victor shareholders had been informed of the unfavorable position of BarChris.

Coleman argued that because he was an "outside" director with respect to the negotiations with Victor, he had no duty to intervene. I disagree. The distinction between an "inside" and an "outside" director is irrelevant in this context, because Coleman did nothing at all. As a director, Coleman had a duty to keep himself adequately informed as to the activities of the corporation. He could no more close his eyes to the purchase of Victor than he could to other important corporate developments. SEC

v. Frank, 388 F.2d 486, 489 (2d Cir. 1968). See Levine v. SEC, 436 F.2d 88, 90 (2d Cir. 1971). Cf. SEC v. Great American Industries, Inc., 407 F.2d 453, 463 (2d Cir. 1968) (en banc) (Hays, C. J., concurring), cert. denied, 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969).

Although Coleman knew that BarChris's condition had worsened considerably, he made no effort to ascertain whether Kircher had conveyed that information to the Victor shareholders. Coleman's vote to approve the exchange of shares was a representation to plaintiff purchasers that he had sufficiently inquired as to the facts upon which the negotiations were based and that he was satisfied with the correctness of those facts. The representation was false.

The appellees vigorously urge and the majority holds that decisions of this court have established that liability in damages for a violation of § 10(b) and Rule 10b–5 cannot be predicated upon the defendant's mere negligence. Close examination of the decisions of this court reveals that this question has not previously been decided.

In Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951) and O'Neill v. Maytag, 339 F.2d 764 (2d Cir. 1964) the negligent failure to fulfill a duty was not in issue. Any language in those cases indicating that active fraud is a requisite in a 10b–5 suit is irrelevant to the instant case. In List v. Fashion Park, Inc., 340 F.2d 457, 464 n. 5 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), the question was specifically left undecided. An oft-quoted statement that a private damage suit under § 10(b) cannot be based on negligence but requires "some" scienter appears in SEC v. Texas Gulf Sulphur Co., supra, 401 F.2d at 855. However as to the individual defendants, the court necessarily found scienter and the question of the corporation's liability for negligent misstatement was left unresolved.

In Heit v. Weitzen, 402 F.2d 909 (2d Cir. 1968), cert. denied, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969), the

court, in passing on the legal sufficiency of a 10b–5 claim for relief, held that the allegation of the individual defendants' actual knowledge of the falsity of certain statements in a corporation's annual report was sufficient. Statements in the opinion concerning the possible insufficiency of allegations based on negligence were therefore unnecessary to the decision. In Globus v. Law Research Service, Inc., 418 F.2d 1276 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S. Ct. 913, 25 L.Ed.2d 93 (1970), this court held that there was sufficient evidence of actual fraud to support the jury verdict. It was therefore not necessary to decide whether a charge to the jury requiring a finding of negligence alone would have been correct, and the court specifically said that it did not deal with that issue. Id. at 1291. See also Moerman v. Zipco, Inc., 302 F.Supp. 439, 446 (E.D.N.Y.1969), affirmed on opinion below, 422 F.2d 871 (2d Cir. 1970). Finally, in Shemtob v. Shearson, Hammill & Co., 448 F.2d 442 (2d Cir. 1971), the court, while stating in dictum that "it is insufficient to allege mere negligence," actually held only that the complaint failed to state a claim for relief under 10b–5 on the ground that the suit was a "garden-variety customer's suit against a broker for breach of contract . . . ." Id. at 445.

Thus this court has not yet adjudicated the scienter-negligence issue.

Other circuits have ruled that scienter is not a necessary element of a 10b–5 claim for relief. See Ellis v. Carter, 291 F.2d 270, 274 (9th Cir. 1961); Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 212 (9th Cir. 1962); Stevens v. Vowell, 343 F.2d 374, 379–380 (10th Cir. 1965); Myzel v. Fields, 386 F.2d 718, 734–735 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); City National Bank v. Vanderboom, 422 F.2d 221, 229–230 (8th Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970). Cf. SEC v. Van Horn, 371 F.2d 181, 185 (7th Cir. 1966).

The legislative purpose behind the enactment of § 10(b) and the promulgation of Rule 10b–5—the protection of investors by requiring the full disclosure of correct information in connection with the purchase and sale of securities—would be advanced by requiring a person in Coleman's position to acquaint himself with developments in important intercorporate negotiations. The fact that he did nothing to inform himself of the progress and character of the negotiations, *at least* after the "point of crisis" meeting, was a breach of a duty he owed as a director and a "controlling person" to the Victor shareholders. That Coleman's failure to act was negligent as opposed to calculated should not insulate him from liability when action on his part might have prevented the fraud perpetrated by the corporation whose activities he was under a duty to supervise. I would hold, therefore, that Coleman's negligent "omission to state material facts" to the purchasers of BarChris stock was a violation of § 10(b) and Rule 10b–5, and that Coleman should be held liable for the damages which the plaintiffs suffered.

The district court held that Drexel could be liable only for the failures of its nominee and agent Coleman on a theory of *respondeat superior*, and that, as Coleman had been exonerated, Drexel won "its case by virtue of the dismissal against both Coleman and Ballard." Because of my view on Coleman's liability I would also reverse the district court's determination with regard to the liability of Drexel & Co.

Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) (1970) provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in

good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action. It seems clear that this section was designed to govern the type of relationship that existed between Coleman and Drexel as well as the kind of transaction that is involved in this case.

Coleman was placed on BarChris's board of directors at the behest of Drexel to protect Drexel's financial stake in the operations of BarChris. The relationship between Drexel and Coleman constitutes control by Drexel within the meaning of § 20(a) and establishes that Drexel did in fact induce Coleman to act or not to act. Myzel v. Fields, supra, 386 F.2d at 738, quoted with approval in Moerman v. Zipco, Inc., supra, 302 F. Supp. at 447.

## IV. *Reliance*

Coleman and Drexel contended on this appeal that reliance is a necessary element of a claim for relief under § 10(b) and Rule 10b–5, and that the district court's finding that plaintiffs, through their agent Shulman, relied on the oral and written misrepresentations is clearly erroneous.

The liability which I find in this case results from the failure of Coleman to speak. In this type of 10b–5 case, affirmative reliance is not necessarily an element of the claim for relief. See Affiliated Ute Citizens v. United States, 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L. Ed.2d 741 (1972). "In nondisclosure cases, reliance has little if any rational role." 2 A. Bromberg, Securities Law —Fraud: SEC Rule 10b–5 at 209 (1967). See 6 L. Loss, Securities Regulation 3876–80 (1969). Even assuming, however, that reliance is a distinct element of the claim for relief in all 10b–5 cases, I believe that had Coleman fulfilled his obligations as a director, plaintiffs and Shulman might well have acted

differently. List v. Fashion Park, Inc., supra.

## V. *Conclusion*

I would reverse the dismissal of the complaint as to defendants Coleman and Drexel & Co.

TIMBERS, Circuit Judge, with whom OAKES, Circuit Judge, joins, concurring in part and dissenting in part:

I concur with the majority in affirming the denial of Kircher's motion for jury trial, but I dissent from the majority's affirmance of the dismissal of the complaint as to Coleman and Drexel & Co.

I join in Judge Hays' eminently sound opinion.

In view of this appeal's rather long gestation period,[1] during which there have been a number of decisions in our Court under § 10(b) and Rule 10b–5 and related antifraud provisions of the federal securities laws, I should like to make clear my position with respect to the standard which I believe should be the basis for the imposition of liability upon Coleman and Drexel.

In short, since I believe that Coleman's conduct constituted reckless disregard for the truth, I would hold Coleman and Drexel liable on that basis under the settled law of this Circuit, without the necessity of reaching the question whether liability may be imposed here for mere negligent conduct.

The following facts in my view demonstrate that Coleman acted in reckless disregard for the truth. He was added to the BarChris board of directors at the behest of Drexel to protect its substantial investment in BarChris. He was the most experienced member of the board with regard to financial and business matters. He was aware that BarChris was acquiring Victor through an exchange of stock since he had voted for

1. Judgment was entered in the district court on October 13, 1970. The appeal originally was argued before a panel of this Court on September 16, 1971. It was reargued before this Court sitting en banc on November 1, 1972.

the acquisition in his capacity as a director. He was aware that BarChris had suffered many business reversals and that it suffered from severe intracorporate dissension. Yet he did not know whether this unfavorable position had been disclosed to Victor.

It became clear at the "point of crisis" meeting held on December 6, 1961 that one of the symptoms of BarChris' lack of effective leadership was a "refusal to accept the fact that basic problems exist[ed] within the Company". Until that time not even the board of directors had openly recognized "the management's inability to cope with the existing problems". Moreover, it was revealed at that meeting that only recently had certain mistakes and problems "come to light". Coleman's experience should have told him that, since neither the board nor the management of BarChris would openly admit *to themselves* until the "point of crisis" meeting that they had serious problems, and since certain mistakes and problems had just recently been discovered, management obviously had not revealed these matters to outsiders such as Victor. But Coleman made no effort whatsoever to discover whether such information had been disclosed.

One of the most significant facts hidden from Victor was that BarChris was suffering internal strife. The very nature of this fact should have caused Coleman to suspect that it had not been revealed to Victor. Intracorporate dissension is a sensitive and delicate matter which management typically (although improperly under the circumstances of this case) considers to be within the confidence of the corporation. There is a natural reluctance to expose the matter to "outsiders". Moreover, all concerned usually experience an optimism (unjustified in the present case) that the problem is not as serious as it seems and promptly will be resolved. Under

these circumstances, there was reason to suspect that the disputing parties—the management of BarChris—had not informed Victor of the problem. Yet Coleman, who was not a party to the internal strife, made no attempt to determine whether Victor had been apprised of this crucial fact.

These facts, as well as others more fully set forth in Judge Hays' opinion, make it clear to me that Coleman's conduct constituted reckless disregard for the truth. Circumstances known to Coleman put him on notice that certain material facts in all likelihood had not been disclosed to Victor. Moreover, Coleman had ready access to sources of information which, had he used them, would have apprised him that these material facts had not been disclosed. We have held that such conduct subjects a person to liability under the antifraud provisions of the securities laws. Cohen v. Franchard Corp., 478 F.2d 115, 123 (2 Cir. 1973), slip op. 2819, 2834 (April 11, 1973); Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 362–364 (2 Cir. 1973), slip op. 4897, 4929–33 (March 16, 1973); Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2 Cir. 1971). A person cannot avoid liability by pleading ignorance where his knowledge and experience tell him that certain events or circumstances known to him require that further inquiry be made. Chris-Craft Industries, Inc. v. Piper Aircraft Corp., *supra,* 480 F.2d at 369–373, slip op. at 4944–51. Coleman should be held liable even though he may not have definitely known whether the material facts had been misstated or omitted because it was evident that he had seen "the seagulls on the water"[2] and had ignored them.

Finally, in not reaching the scienter-negligence issue in the instant case, I wish to make it clear that I do not necessarily disagree with Judge Hays' views on that issue.[3] Since the record

2. As experienced mariners know, well in advance of a storm seagulls assume a V-formation on the surface of the water, heading into the wind to weather the

storm. When old salts see this, they take heed and prepare for the storm.

3. Especially since it is well recognized that Judge Hays' views on the meaning of

before us so clearly demonstrates Coleman's reckless disregard for the truth, I would limit our holding to that basis of liability in this case. SEC v. National Securities, Inc., 393 U.S. 453, 465 (1969). And I would leave to another day the adjudication of the scienter-negligence issue—in a case where the *only* basis for imposition of liability in a private action for damages under § 10(b) and Rule 10b–5 is negligence. This is not that case.

---

Rule 10b–5 for years have been in the vanguard of important developments in this area. See, e. g., Superintendent of Insurance v. Bankers Life and Casualty Co., 404 U.S. 6 (1971), unanimously rev'g 430 F.2d 355 (2 Cir. 1970) (Hays, C. J., dissenting); Schoenbaum v. Firstbrook, 405 F.2d 215 (2 Cir. 1968) (en banc opin-

ion by Hays, C. J., reversing panel decision from which Hays, C. J., dissented), cert. denied, 395 U.S. 906 (1969).

